**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

UNITED STATES OF AMERICA


                        - v -                                          5:02-CR-51
                                                                       (HGM/RFT)

ALEXANDER SALVAGNO,
RAUL SALVAGNO
                                        Defendants
_____

**APPEARANCES:**                                      **OF COUNSEL:**


**FOR THE UNITED STATES**:

HON. GLENN T. SUDDABY                          CRAIG A. BENEDICT
United States Attorney for the                 THOMAS CAPEZZA
Northern District of New York                  Assistant United States Attorneys
P.O. Box 7198
100 South Clinton Street
Syracuse, New York 13261-7198

**FOR ALEXANDER SALVAGNO**:

Alexander Salvagno                             *PRO SE*
Reg. No. 11212-052
FCI Otisville
Federal Correctional Facility
P.O. Box 1000
Otisville, New York 10963

**FOR RAUL SALVAGNO**:

Raul Salvagno                                  *PRO SE*
Reg. No. 11220-052
FCI Otisville
Federal Correctional Facility
P.O. Box 1000
Otisville, New York 10963

**FOR LITMAN, ASCHE, & GIOIELLA, LLP**

LITMAN, ASCHE & GIOIELLA, LLP                  RICHARD M. ASCHE, ESQ.
*45 Broadway Atrium*                           RUSSELL M. GIOIELLA, ESQ.

New York, New York 10006

**RANDOLPH F. TREECE**
**U.S. MAGISTRATE JUDGE**

<u>**REPORT-RECOMMENDATION AND ORDER**</u>[1]

As we have noted previously, this case has an extensive history.  The Government's pending

Motion for Forfeiture of Attorney Fees has an exhaustive history of its own as well.  Dkt. No. 531.

Although the history of this case has been recounted in other Decisions, Orders, and in a recent Report-

Recommendation, a reiteration of the history is unavoidable.  Because of the Motion's complexity, the

many factual and legal permutations, and the comprehensive record on this issue visited upon this

Court, we are compelled, once again, to furnish an in-depth recitation of the facts and the legal issues.

## I.  CASE HISTORY

---

[1]  Pursuant to an Order, dated February 22, 2006, this Motion for Forfeiture as well as a possible conflict of interest issue were referred to this Court by the Honorable Howard G. Munson, Senior United States District Judge.  Dkt. No. 575. On April 21, 2006, this Court issued a Report-Recommendation addressing the possible conflict of interest between the Salvagnos and their attorneys, Litman, Asche, Gioiella, LLP ("LAG").  Dkt. No. 614.  We recommended that there was, at a minimum, a potential conflict of interest which neither Alex nor Raul Salvagno were willing to waive.  Based upon their unwillingness to waive the potential conflict of interest, it was further recommended that LAG be permitted to withdraw as counsel to both Alex and Raul Salvagno.  *Id.* at p. 17.  Since our Report-Recommendation would permit LAG to withdraw, this Court further discussed with the Salvagnos the appointment of counsel.  *Id.* at pp. 15-17.  Neither Salvagno wished for this Court or Senior Judge Munson to assign counsel to represent them until this Motion is resolved, and thus, we were hamstrung in even assigning standby counsel.  For this reason, Alex and Raul Salvagno are representing themselves *pro se*, notwithstanding this Court's most recent overture of May 26, 2006, for them to submit current financial affidavits so that counsel could be appointed.  Subsequent to the Report-Recommendation addressing the conflict of interest issue, the Salvagnos have been representing themselves *pro se*, including during the Hearing held before this court on June 12, 2006. (For purposes of this Report-Recommendation, this Court's June 12, 2006 Hearing will be hereinafter referred to as "Hr'g" and Transcript will be abbreviated as "Tr.").  And, on June 30, 2006, Senior Judge Munson scheduled the Salvagnos' re-sentencing for September 13, 2006, and appointed standby counsel for each Defendant.  Dkt. Nos. 650-51.

On July 13, 2006, Raul Salvagno submitted a Petition for a Writ of Mandamus to the Second Circuit seeking to have the forfeiture issue decided prior to re-sentencing.  *See* Dkt. Nos. 653-54; *see also infra* Note 34.  We note that the Second Circuit recently denied Alex Salvagno's prior Petition for a Writ of Mandamus seeking to have the forfeiture issue decided prior to the potential conflict of interest issue.  *See* Dkt. No. 652, Mandate, dated July 14, 2006 (holding that Alex Salvagno failed to "satisfy the burden of showing the 'presence of a legal issue whose resolution will aid in the administration of justice' . . . or a 'clear and indisputable' right to the issuance of the writ").  Though Raul's recent Petition has been forwarded to the Second Circuit, we note that in light of the Second Circuit's ruling on the first Petition and in light of the timing of the issuance of this Report-Recommendation, such Petition may be rendered moot.

Lastly, we note that only Raul Salvagno's assets are implicated in this Report-Recommendation.

A.  Indictment to Guilty Verdict.

This prosecution commenced with a twenty-one (21) count Indictment against a battalion of Defendants, however, the primary Defendants are AAR, Contractor Inc. (AAR), Alex and Raul Salvagno.  Dkt. No. 1.  It is alleged, *inter alia*, that the Salvagnos, along with others, engaged in a racketeering conspiracy (Count 1), in violation of the Racketeer Influenced and Corrupt Organizations (RICO) Act, 18 U.S.C. § 1962(d), and further committed money laundering, in violation of 18 U.S.C. § 1956(a)(1)(A)(I).  *Id.*  The crux of the Indictment is that the Defendants conspired to defraud the United States and others by violating the Clear Air Act, 42 U.S.C. § 7401 *et seq.*, and the Toxic Substance Control Act, 15 U.S.C. § 2601, *et seq.*  The Indictment alleges that certain amounts from specific contracts deemed to be a part of the racketeering activity were deposited into AAR's bank account with Fleet Bank and that such deposits constituted money laundering.  Dkt. No. 1 at ¶¶ 32, 33, 41, 42, 46, 47, 64, 65, 69, 70, 75, 76, 84, & 85.

Pertinent to our discussion is the forfeiture allegation with reference to substitute assets within the Indictment as to the Count 1 RICO violations.  *Id*. at ¶¶ 226-230.[2]  Prior to trial, the Government did not seek a prior restraint nor seizure of any of the Defendants' assets.

Throughout the pretrial and trial phase, Raul Salvagno was represented by Emil Rossi, Esq. After a lengthy trial that spanned six months, on March 30, 2004, the jury returned a verdict of guilty as to both Alex and Raul Salvagno.  With regard to Raul Salvagno, he was found guilty of Counts 1, 2, 4 and 11.  Dkt. No. 320, Verdict Sheet; Hr'g, dated June 12, 2006, Ex. LAG-A.  As to Count 1 of the Indictment (Racketeering Conspiracy) only, he was found guilty of the following predicate RICO acts:

---

[2] No specific asset is identified in the forfeiture allegation within the Indictment and reference is made only to the statutory language of 18 U.S.C. § 1963(a)(3).  Dkt. No. 1 at ¶¶ 227-28.  The same holds true for the substitute asset provision, which is solely a verbatim recitation of 18 U.S.C. § 1963(m).  *Id.* at ¶ 229.

#15 (Troy Central School District), #16 (East Greenbush Central School District), #17 (Ballston Spa Central School District), #18 (Niskayuna Central School District), #19 (Averill Park Central School District), #20 (Emma Willard School), #21 (Bolton Central School District), and #22 (Schenectady Central School District).[3] Dkt. No. 320, Verdict Sheet; Hr'g Ex. LAG-A. After the jury verdict, Senior Judge Munson charged the jury on the Forfeiture consequences. The jury returned a Special Verdict as to Raul Salvagno in the amount of $1,707,156.40, the contract value of the above-mentioned projects, and, as the amount of property acquired or maintained by him in violation of 18 U.S.C. § 1962, the Special Verdict did not include the SUNY Plattsburgh (#26) and GE Cafeteria (#27) contracts since these predicate acts were not proven as to him. Dkt. Nos. 320, Special Verdict Form, & 306, Min. Entry, dated Mar. 30, 2004; Hr'g Ex. Gov't-16.[4]

After the verdict, which required an extensive hearing, Alex and Raul Salvagno were eventually released on conditions of release. Dkt. Nos. 316-17.[5] The issue of release pending sentencing lasted

---

[3] The alleged primary objectives of the racketeering conspiracy were, *inter alia*, to enrich the Defendants by failing to perform asbestos abatement in private and public buildings in compliance with legal requirements, falsifying laboratory analyses, billing customers for work not performed, bid rigging, and money laundering. Dkt. No. 1 at ¶ 10. Each enumerated predicate RICO act listed above represents a contract in which it was alleged that racketeering activity occurred. *See generally id.* In reference to Count 1 of the Indictment (Conspiracy), as to Raul Salvagno, the predicate RICO act was found not proven in #26 (SUNY Plattsburgh) and #27 (GE Cafeteria). Further, he was not indicted on acts #23 (Watervliet Arsensal), #24 (Old Hellman Theatre), #25 (Ford Green Island Plant), #28 (NYS Capitol Building), #29 (Green Haven Correctional Facility), #30 (S.W. Pitts Hose Co.), #31 (Niagara Mohawk), #32 (FC Hastings, L.P.), and #33 (Troy YMCA). Dkt. No. 320, Verdict Sheet. All of this discussion may become relevant in our overall discussion as to whether these contract proceeds flowed into Raul Salvagno's personal Retirement Accounts. *See infra* Part II.B.

[4] A Judgment of Conviction setting forth the amount of the property to be forfeited as to Raul Salvagno was filed after the sentencing on January 28, 2005 (Dkt. No. 404), which Judgment was amended on February 11, 2005 (Dkt. No. 422).

[5] Both Salvagnos were released on $1,000,000 bond. At the direction of the Court, Raul Salvagno submitted a Financial Statement, dated April 5, 2004, to the Court and apparently a copy was provided to the Government. Hr'g Ex. Salvagno-A-1. Parenthetically, this would appear to be a collateral event to this Motion, however, during the Hearing held on June 12, 2006, the Government raised that they were not aware of Raul's personal Morgan Stanley Retirement Account until after September 2004. A copy of the Financial Statement was submitted to this Court to challenge the credibility of the Government's claim and to show that they were or should have been apprised of such Retirement Account in April 2004. *Id.* This may be relevant to further discussion within this Report-Recommendation. *See infra* Part II.B.

for months.  Dkt. Nos. 349, Order, dated Sept. 10, 2004 (accepting bail package),[6] & 352, Gov't Lt.-

Brief.

B.  Preliminary Forfeiture Order to Final Sentencing Judgment.

Approximately a month and a half after the verdict, on April 20, 2004, Senior Judge Munson

signed a Preliminary Order of Forfeiture (POF) as to both Alex and Raul Salvagno.  Dkt. No. 324, POF,

dated Apr. 20, 2004; FED. R. CRIM. P. 32.2(b)(1).  Rather than directing the Salvagnos to forfeit specific

property, the POF stated, in part, which is imminently relevant to this discussion, that a "forfeiture

money judgment in the amount of $1,707,156.40 shall be entered against [] Raul Salvagno as the joint

and several amount of the property derived from proceeds directly or indirectly from defendant's

racketeering activities, in violation of 18 U.S.C. § 1962 . . . [and] this [POF] shall become final as to

the defendant at the time of sentencing, or before sentencing if the defendant consents, and shall be

made part of the sentence and included in the judgment."  Dkt. No. 324 at pp. 2-4.  Furthermore, the

POF gave the Government the following rights:

> United States Attorney is authorized to conduct any discovery proper in identifying,
> locating, or disposing of the property subject to forfeiture, in accordance with FED. R.
> CRIM. P. 32.2(b)(3).  In the event property is located, the United States shall publish
> notice of the order and its intent to dispose of the property . . . . [D]iscovery may be
> conducted and . . . the United States is authorized to commence any applicable
> proceeding to comply with statutes governing third party rights . . . .The United States
> shall have clear title to the subject property following the Court's disposition of all
> third-party interests . . . .

*Id*. at pp. 2-3; *see also* FED. R. CRIM. P. 32.2(b)(3) (authorizing the Government to seize the specific
property, conduct any discovery, and to commence proceedings that comply with any statutes
governing third-party rights).

Lastly, within the POF, the Court retained jurisdiction in order to enforce the Order and allow

---

[6] Based upon an application to amend and/or modify the September 10, 2004 Order regarding bail surety conditions by the Government (Dkt. No. 352), Senior Judge Munson issued an Order of Forfeiture, based upon the parties' agreement, that the said real property posted as surety shall be attached to the Agreement to Forfeit Property (Dkt. No. 357, Order, dated Oct. 1, 2004).

amendments thereto, if necessary.  Dkt. No. 324 at p. 4.

On or about September 30, 2003, Raul Salvagno transferred between his personal Morgan Stanley IRA Retirement Accounts - a combination of two other retirement funds - the amount of $269,552.46.  Hr'g Ex. Gov't-8.  From the Morgan Stanley Account (66x-xxx284), on or about June 28, 2004, the sum of $200,000 was withdrawn and deposited in his Wachovia Joint Checking Account with his wife.  *Id*.

Shortly after the issuance of the POF and prior to sentencing, which was initially scheduled for September 10, 2004, Raul Salvagno, in particular, consulted with attorneys other than his trial counsel.  Dkt. No. 531, Gov't Mot. for Forfeiture, Ex. 2, Raul Salvagno Lt., dated Mar. 17, 2005 (listing attorneys).  One of those law firms consulted was LAG.  The terms of the LAG retainer appear to have been in flux because Raul Salvagno would modify them, however, the Court and the parties are certain that, basically, LAG was retained to provide legal services for sentencing and appeal and a retainer in the amount of $200,000 was required.  Dkt. No. 620, Gov't Reply Lt.-Mem., dated May 4, 2006, Attach. A (copies of Retainer Letters).  Pursuant to the terms of the retainer agreement, LAG was paid $150,000 on July 7, 2004, and $50,000 on September 21, 2004, from Raul Salvagno's Wachovia Joint Checking Account.  Hr'g Ex. Gov't-8.  In compliance with the Probation Office's request, sometime in September 2004, the Salvagnos submitted further financial information listing this transfer of funds to LAG and others for counsel fees.  Dkt. No. 579, LAG Mem. of Law at pp. 5-6.  It also appears that at approximately the same time, LAG was already representing  the Salvagnos, jointly, on the sentencing, however, they were not officially designated or added to the case docket until October 22, 2004.  *See* Dkt. No. 362, Notice of Appearance, dated Oct. 12, 2004.

After a lengthy sentencing hearing, extended by expert testimony, commencing on October 27,

2004, and continuing intermittently for sixteen days until December 3, 2004, on December 23, 2004, Raul Salvagno was sentenced to a period of imprisonment of 235 months, forfeiture of property in the amount of $1,707,156.40, and restitution in the amount of $22,875,575.46.  Dkt. No. 403.  The POF, with the Forfeiture Judgment, became final after the sentencing and upon the filing of a Judgment of Conviction (Dkt. No. 404) on January 28, 2005, which was amended on February 11, 2005 (Dkt. No. 422).  The Amended Judgment only mentions that Raul Salvagno shall forfeit his interest in property outlined in the Forfeiture Allegation and as determined by the jury in the amount of $1,707,156.40; no specific asset is identified to be forfeited.  Dkt. No. 422 at p. 6.

    C.  Motion for Forfeiture of Attorney Fees.

    On February 25, 2005, the Government filed an *Ex Parte* Application requiring, *inter alia*, LAG to pay the Government, by certified check, the sum of $200,000, and that the District Court should enter a restraining order for the relief requested.  Dkt. No. 425.  Based upon the Government's Application, Senior Judge Munson issued a Post-Conviction, Post-Forfeiture Restraining Order, which, *inter alia*, restrained LAG from wasting or encumbering the $200,000 and directed them to pay the sum directly to the Government.  Dkt. No. 426, Order, dated Feb. 25, 2005.[7]  Promptly after the District Court unsealed the Government's Application for the Post-Conviction, Post-Forfeiture Restraining Order (Dkt. No. 431), LAG asked the District Court to establishing a briefing schedule on the Government's Application, which was granted on March 4, 2005 (Dkt. No. 432).[8]  A hearing on the Restraining Order was held on March 31, 2005.  Dkt. No. 522, Hr'g Tr.; Dkt. No. 531, Gov't Mot. for Forfeiture, Ex. 6.

---

[7]  This Post-Conviction, Post-Forfeiture Restraining Order confirmed that the POF specifically ordered Raul Salvagno to forfeit $1,707,156.40, by a money judgment, as the amount of property derived from proceeds obtained directly or indirectly from his racketeering activity.  Dkt. No. 426 at p. 2.

[8]  Competing memoranda of law were filed with the District Court.  *See* Attach. A to this Report -Recommendation and Order (Dkt. Nos. 437, 438, 439, 440, & 445).  This Court has reviewed those memoranda for this current Motion.

In the interim, Raul's sentence was appealed, among other issues. Dkt. No. 401, Not. of Appeal, dated Dec. 27, 2004.  Based upon *United States v. Crosby*, 397 F.3d 103 (2d Cir. 2005), the Second Circuit granted the Government's request for a remand to determine if re-sentencing was necessary in light of *United States v. Booker*, 543 U.S. 220 (2005).[9]  Dkt. No. 508, Gov't Lt., dated May 16, 2005; Dkt. No. 512, Mandate, dated May 25, 2005.  Nothing further occurred as to the briefing on the Restraining Order until the Government filed a Motion for Forfeiture of Property – the $200,000 paid to LAG in partial satisfaction of the money judgment against Raul Salvagno. Dkt. No. 531, Gov't Mot. for Forfeiture, dated Nov. 23, 2005.  Approximately a month thereafter, Alex and Raul Salvagno filed a *Pro Se* Motion asking the District Court to hold the Forfeiture Motion Hearing in abeyance until a conflict of interest issue between the Salvagnos and LAG was decided.  Dkt. No. 537, *Pro Se* Mot.; *see also* Dkt. No. 556, *Pro Se* Lt., dated Feb. 1, 2006 (seeking hearing on the conflict of interest issue). On February 2, 2006, the date set for the re-sentencing, rather than address re-sentencing, Senior Judge Munson heard arguments on the Motion for Forfeiture, which consumed the entire day.  At the end of this hearing, Senior Judge Munson reserved decision on the Motion but relieved trial counsel for the Salvagnos from further legal responsibilities to their respective clients.  Dkt No. 557.  On February 3, 2006, Senior Judge Munson referred both the conflict of interest issue and the Motion for Forfeiture to the Honorable George L. Lowe, United States Magistrate Judge, for a Report-Recommendation.  Dkt. No. 559.  Because of a conflict, Judge Lowe recused himself and the matter was referred to this Court. *See supra* note 1.

In terms of addressing the myriad of issues pertaining to the Motion for Forfeiture, this Court

---

[9]  In *United States v. Booker*, 543 U.S. 220 (2005), the Supreme Court found the Sentencing Guidelines were unconstitutional.

has received exhaustive briefing from both parties.  *See* Attach. A.[10]  And, on June 12, 2006, a  Hearing

was held.  Dkt. No. 634.

D.  June 12, 2006 Hearing.

This Hearing had a dual purpose.  Notwithstanding the Government's binary approach to seize

these funds – as either tainted assets or substituted assets – the Court heard proof from the Government

that the $200,000 paid to LAG was property directly or indirectly derived from Raul Salvagno's

racketeering activity.  In order to lay bare any and all issues related to this Motion, the parties were

given an opportunity to make any further arguments.[11]  The gist of the Government's proof was an

endeavor to show, by the preponderance of the evidence, that the funds paid to LAG, after the issuance

of the POF, can be tracked from the  predicate RICO acts committed by Raul Salvagno.  In short, if we

review the Government's proof in inverse order, it would show that the $200,000 paid to LAG came

from Raul Salvagno's Wachovia Joint Checking Account that was replenished by funds withdrawn

from his personal Morgan Stanley IRA Account, which was partially funded by AAR's Employees'

Pension Fund, that, in turn, was funded by monies received from the RICO conspiracy.  Indeed, to

appreciate this proof, we are compelled to tediously reveal the facts in considerable detail.

The Government called one witness, Justus Derx,[12] resident agent in charge of the Upstate New

York regional office for the criminal investigation division of the Environmental Protection Agency

(EPA) and who assisted in the prosecution of this indictment; the Government also introduced into

---

[10]  The pertinent memoranda are designated as Docket Numbers 579, 580, 590, 615, and 620.  *See* Attach. A.  The Court will also take into consideration Post-Hearing Letter-Memoranda.  *See* Dkt. Nos. 635 & 637.

[11]  It is not clearly established that Raul and Alex Salvagno, who were appearing *pro se*, have standing regarding this Motion, however, this Court allowed them to participate in the Hearing as if they did hold such standing.

[12]  Justus Derx has a degree in accounting and was asked to create charts to assist the Court in tracing the proceeds through various accounts into the custody of LAG.  Hr'g Tr. at 19-22.

evidence seventeen Exhibits.  Rather than submit all of the relevant documents in its possession, which was a box full of documents present in the courtroom for further reference if necessary, Exhibits 1-8 were essentially summaries and flow charts based also upon the comprehensive record submitted at trial as they relate to the predicate RICO conduct and the funds received by LAG.  These Exhibits can best be described as interlocking links attempting to follow the proceeds from RICO activity right into the hands of LAG in July and September 2004.

Without any dispute, AAR had one central operating account with Fleet Bank, wherein most, if not all, of its expenses were paid.  It appears that all funds, no matter the source or activity, or whether tainted or "clean," or even borrowed, ran through this account.  Hr'g Tr. at 23 & 56 ("The forfeited money would be commingled amongst the $21,000,000.").  It was alleged at trial that there were 1,555 projects where AAR was hired to remove asbestos and used the services of Analytical Laboratories (Analytical Labs), the crucible of this RICO prosecution.

Exhibits 1 and 2 are the summaries of all of the monies paid to AAR by private and public entities on the 1,555 aforementioned projects for asbestos abatement in which Analytical Labs was used for the period of 1991 to 1999, the period of the RICO conspiracy.  The total sum of those 1,555 projects is $21,595,589.42.  Hr'g Exs. Gov't-1 & 2 (the list of the 1,555 projects with invoice amounts); Hr'g Tr. at  25-27.  Exhibit 3 is an analysis of gross deposits to the operating account for the period of 1995 to 1999.  This five-year duration, which is critical for our discussion, reflects the period when AAR made contributions into its employees' retirement account.  Further, this chart reflects receipts from all of AAR's jobs, including "clean" proceeds as well as those identified to be illegal funds.  Hr'g Tr. at 30, 56, & 60 ("[F]orfeited funds and non-forfeited funds . . . [were] all commingled.").  The most pertinent information garnered from Exhibit 3 is the analysis of total deposits as compared to illegal

deposits during this period.  On average, illegal deposits were 50% of the gross deposits.[13]  *Id*. at 32.

Notwithstanding these overall figures as to illegal proceeds, the $1,707,156.40 judgment, the true

subject of this Motion, is composed of approximately seventeen RICO predicate acts attributable to

Raul Salvagno.  *See* Hr'g Tr. at 109-110 (how the judgment was calculated); *see also supra* Part I.A

& note 3.

Exhibit 5 attempts to identify those seventeen RICO predicate acts, from 1995 to 1998, and

follow their proceeds into the central operating account, where eventually sum payments were made

into the employees' retirement account managed by the Proctor Group.[14]  The two far left columns of

this Exhibit list nineteen projects that constitute predicate RICO acts during 1994 to 1998 and the

amounts paid by AAR's customer.  As stated above, however, only seventeen of those predicate acts

are assigned to Raul Salvagno.  Hr'g Tr. at 36.[15]  The far right column of this Exhibit indicates the sum

---

[13]  During cross examination, we learned that for the period of 1990 to 1999 a total sum of $40,000,000 went through this Fleet Account.  Hr'g Tr. at 103-05.  If Exhibit 1 correctly intimates that $21,595,589 was derived from illegal activity, the corresponding percentage of illegal funds to gross receipts may be approximately 53%.  *See id*. at 104-05.  Further, it appears that the District Court relied primarily on these numbers to assess the criminal restitution for Raul Salvagno at $22,875,575.46.  *See* Hr'g Ex. Gov't-4; Dkt. No. 403, Minute Entry on Sentencing; Hr'g Tr. at 33-34.  The relative calculation of the amount of restitution, though not particularly relevant as to this Motion, was discussed on the record inasmuch as it is a discrete element of the sentence.  Hr'g Tr. at 33-34.  Lastly, the amount of the personal money judgment against Raul Salvagno represents "6.5% of the total receipts or total expenditures of AAR during [the period of 1994 to 1999]."  *Id*. at 56-57.  We cannot also forget that AAR borrowed from its line of credit, which funds were deposited into the operating account too.  The Hearing Record does not disclose the amount of borrowing on this line for the relevant period however.  *Id*. at 105.

[14]  The amount of the proceeds paid on these individual projects are set forth in Exhibit 6.  Hr'g Tr. at 43-44.

[15]  There was considerable debate about whether Raul Salvagno was convicted of seventeen predicate acts or less.  *See* Hr'g Tr. at 36-38, 58-60, 94-103, & 106.  If we were to rely solely upon LAG's and the Salvagnos' interpretation, he was convicted of fewer RICO acts.  When comparing the farthest left column with the Jury Verdict Sheet, we discern that Raul Salvagno was either not charged with or not found guilty of those predicate RICO acts.  *See* Hr'g Exs. Gov't-5 & LAG-A (Jury Verdict Sheet); Hr'g Tr. at 36-38, 58-60, 94-103, & 106.  The second column on this Exhibit reflects those eight proven RICO acts per the Jury Verdict Sheet.  In terms of the Government's perspective, Raul Salvagno was convicted of Count 1, a RICO Conspiracy that encompasses seventeen RICO predicates.  Hr'g Tr. at 95.  Whether it is eight or seventeen RICO predicate acts is of no moment for this Court because it is already law of the case as the amount of the personal money judgment as to Raul Salvagno, which is $1,707,602.98.  Dkt. Nos. 404 & 422.  And we know that the seventeen RICO predicates total the personal judgment sum.

The law of the case doctrine is a seminal principle of law.  Essentially under this doctrine, any decision rendered

-11-

of money paid into the company's retirement account on behalf of Raul Salvagno.  We learned that the initial payment made into this account of $30,000 in 1994 predates the relevant RICO acts or violations, and thus is not considered, under any interpretation, forfeited funds.  Hr'g Tr. at 38 & 62.  From 1995 to 1998, a total of $112,339 was paid into the business's retirement account on behalf of Raul Salvagno through the central operating fund.  Hr'g Ex. Gov't-5; Hr'g Tr. at 42 ("[G]enerally [the annual payments were] made after the calendar year.") & 75 (indicating that "contributions to the pension on behalf of Raul [Salvagno] stopped [in 1998]").  A detailed analysis of Raul Salvagno's respective share of the Proctor Group retirement fund is prominently displayed in Exhibit 7.  The Exhibit has several columns that depict the beginning ($30,000) and ending balances ($228,228.24) of Raul Salvagno's Proctor Group account for the period of 1994 to 1998, the annual contributions to his account, the annual gains on the investment which were healthy returns,[16] and that portion forfeited into his accounts

---

on an issue of law made at one stage of a case becomes a binding precedent to be followed throughout the litigation.  *In re PCH Assoc.*, 949 F.2d 585, 592 (2d Cir. 1991) (citations omitted).  The Second Circuit concluded that:

> '[T]he doctrine posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case.'  *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 815-16, 108 S.Ct. 2166, 2177, 100 L.Ed.2d 811 (1988) (quoting *Arizona v. California*, 460 U.S. 605, 618, 103 S.Ct. 1382, 1391, 75 L.Ed.2d 318 (1983) (dictum)).  This doctrine is a discretionary rule of practice and generally does not limit a court's power to reconsider an issue.  1B *Moore's Federal Practice* ¶ 0.404[1], at 120 ('[L]aw of the case is . . . a rule of practice and not a limit on authority.').

*Id.* at 592 (typefaces in original).

The underlying considerations for this doctrine are obvious:  to maintain fairness to the parties; to maintain consistency throughout the litigation; to avoid reconsideration of matters once decided during the course of the litigation; and to promote judicial economy and societal interest in finality.  *Prisco v. A & D Carting Corp.*, 168 F.3d 593, 607 (2d Cir. 1999) (a litigant should not be allowed to disregard this doctrine to prejudice the party seeking the benefit of the doctrine); *see also County of Suffolk v. Stone & Webster Eng'g Corp.*, 106 F.3d 1112, 1117 (2d Cir. 1997); *Soto-Lopez v. NYC Civil Serv. Comm.*, 840 F.2d 162 (2d Cir. 1988).

[16]   It appears that in the first year, on a $30,000 investment, Raul Salvagno received a gain in value of approximately $5,000.  Hr'g Tr. at 75.  Moreover, overall, this pension fund netted a return on investment of approximately 27%.

when another employee left the company early without vesting.[17]  Hr'g Tr. at 44 & 45.  When Raul Salvagno withdrew his vested retirement from the Proctor Group Fund and transferred the withdrawn funds to his private IRA Account with Morgan Stanley in 2001, the account had a value of $228,228.24.  *Id*. at 47.

Exhibit 8 is a comprehensive summary, a flow chart if you will, of all of the previously mentioned Exhibits attempting to trace the source of the funding from the seventeen RICO predicate acts directly to the $200,000 paid to LAG by Raul Salvagno.  *Id.* at 48.  The far left column of transactions pertain to Raul Salvagno's personal Prudential Securities IRA accounts.  Over an eight-year period, Raul Salvagno had a series of Prudential Securities IRA(s).  The record reflects that the Prudential IRA(s) were started in 1992 with $12,000, probably rollover IRA funds earned by Raul Salvagno when he worked for General Electric (GE), and it is also a fair and reasonable estimation that he invested at least $2,000 per year from 1993 to 2000.  *Id.* at 92.  In 2000, these IRA(s) were closed and the ending balance of $44,512 was transferred into Raul Salvagno's Morgan Stanley IRA Account (#44x-xxx967).  From the record, it is generally uncontroverted that none of these funds came from the RICO activities or even directly from AAR.  *Id*. at 48-50.

Exhibit 8 continues to show that AAR's operating account received $1,737,602.98 from those contracts related to the seventeen RICO predicate acts.  We also learned that, from January 1994 to March 1999, AAR contributed $262,807.28 into its employees' retirement account.  As noted above, as of May 23, 2001, Raul Salvagno's vested portion of the employees' retirement account was $228,228.24, of which $159,355.17 was transferred into Raul Salvagno's Morgan Stanley IRA Account

---

[17]  The specific annual contribution to Raul Salvagno's retirement was garnered from the Proctor Group Pension Fund annual reports, which were marked for identification and used for the limited purposes of identifying those amounts. Hr'g Exs. Gov't-11-15; Hr'g Tr. at 85-92.

(#44x-xxx967).  *Id.* at 48-51.  The monies transferred into Raul Salvagno's personal Morgan Stanley

IRA Account was then shifted into yet another personal Morgan Stanley IRA Account (#66x-xxx284).

Although the record does not reflect the actual date, however, it is believed to be September 30, 2003,

the initial Morgan Stanley Account was closed and all of the funds, totaling $269,552.46, were

transferred into the latter Morgan Stanley IRA Account (#66x-xxx284).  Thus, at a minimum, on or

about May 2001, a three-year period prior to any funds being given to LAG, the total investment in this

latter Morgan Stanley IRA Account was $204,054.17.  *Id.* at 76.  On or about June 28, 2004, when the

account had at least $269,552.46, and after Raul Salvagno's conviction and the issuance of the POF,

$200,000 was transferred from this IRA Account to Raul Salvagno and his wife's Wachovia Joint

Checking Account (#11xxxxxxxxx891).  *Id.* at 52-54.  From the Wachovia Account, Raul Salvagno

paid LAG $150,000 on July 7, 2004, and $50,000 on September 21, 2004.  *Id.* at 54.

Most, if not all, of LAG's Exhibits were relevant bank statements and copies of checks

representing payments into AAR's employees' retirement account.  *See* Hr'g Exs. LAG-A-J; *see also*

Attach. B.  Succinctly, the marrow of these exhibits was to show, arguably, that there was no direct link

or association with deposits from the seventeen RICO predicate acts (the tainted funds) immediately

prior to the date when the checks for the retirement accounts were issued.  Hr'g Tr. at 63-74.  In some

instances, you could see a correlation between the deposits and the issuance of the check, however, in

many others the connection between the two financial events was extremely blurred.  *See* Hr'g Ex.

Gov't-17.

## II.  DISCUSSION

The Government's Motion to Forfeit Attorney Fees is in actuality a hydra-headed pursuit of the

attorney fees paid to LAG by Raul Salvagno.  The first prong of this Motion asserts that the $200,000

paid to LAG is in fact proceeds derived from racketeering activity.  However, in the event this Court does not find that these monies are proceeds, the Government's second prong of attack is that these funds are substituted assets, which, nonetheless, should be subjected to forfeiture.  Similarly, LAG's and the Salvagnos' challenge to the forfeiture of fees is multi-pronged: (1) the fees are not proceeds derived directly or indirectly from predicate RICO acts; (2) the tracing of proceeds from AAR's operating account establishes that they are commingled funds; (3) at best, the attorney fees may be considered substituted assets of which there was no prior notice that the fees would be subject to forfeiture; and (4) in any event, the attorney fees are now unreachable in that they have been fully exhausted by the law firm in providing legal services for value to Raul Salvagno.  Consistent with the complex facts set forth above, the issues to be discussed are plagued with numerous permutations, thus, we cannot avoid yet another elaborate, near serpentine, discourse on the nature of the funds and the consequence of the Motion.  In commencing our discussion, we observe that there are concurrent statutory schemes at play when assets are being forfeited, which must be read in tandem, with equal measure.

### A.  Statutory Scheme and General Rules of Forfeiture.

Raul Salvagno was convicted, *inter alia*, of a RICO conspiracy, pursuant to 18 U.S.C. § 1962(d).  A jury returned a special verdict finding that a judgment in the amount of $1,707,156 constituted Raul Salvagno's interest in property acquired or maintained in violation of 18 U.S.C. § 1962.  Hr'g Ex. Gov't-16; FED. R. CRIM. P. 32.2(b)(1).  The controlling statute in terms of criminal penalties in RICO cases is found at 18 U.S.C. § 1963(a)(3): Whoever violates any provision of section 1962 . . . shall forfeit to the United States . . . any property constituting, or derived from any proceeds which the person obtained, directly or indirectly, from racketeering activity[.]"  It was the intent of

Congress to revive the concept of forfeiture broadly as a criminal penalty and punishment against the individual defendant. *United States v. Hall*, 434 F.3d 42, 59 (1st Cir. 2006); *United States v. Robilotto*, 828 F.2d 940, 948-49 (2d Cir. 1987); *United States v. Horak*, 833 F.2d 1235, 1242 (7th Cir. 1987); *United States v. Ginsburg*, 773 F.2d 798, 800 (7th Cir. 1985). Upon conviction and after a jury finding, the Court is mandated to enter a judgment of forfeiture and shall also authorize the Government to seize "all property ordered forfeited upon such terms and conditions as the court shall deem proper." 18 U.S.C. § 1963(e). An imposition of forfeiture does not become final until sentencing. *Id*. at § 1963(a); *United States v. Gilbert*, 244 F.3d 888, 924 (11th Cir. 2001) ("It is beyond doubt that criminal forfeiture is part of defendant's sentence . . . and forfeiture order . . . becomes final . . . when the court issues its [sentencing] judgment.") (citations omitted).[18]

This RICO statute, as well as the Federal Rules, also provides the Government with ample munitions in enforcing this criminal penalty. Among the panoply of weapons provided to the Government, and in addition to the power of seizure, upon appropriate application, the property subject to forfeiture under this section of law may be subjected to a court ordered restraining order, 18 U.S.C. § 1963(d)(1), witnesses who have relevant knowledge about the forfeited property may be deposed, 18 U.S.C. § 1963(k), and, if property cannot be located, is substantially diminished in value, or commingled with other property, which cannot be divided without difficulty, any other property of the defendant can be ordered forfeited, 18 U.S.C. § 1963(m). *United States v. Regan*, 858 F.2d 115 (2d Cir. 1988) (noting that section 1963 authorizes restraint of potentially forfeitable property); *see also United States v. Paccione*, 964 F.2d 1269, 1275 (2d Cir. 1992) (citing *Regan* to confirm the rule that a restraining order's purpose, under this law, is to preserve forfeitable assets in RICO cases, which can

---

[18] The POF, as much, reiterates this principle of law. *See supra* Part I.B at p. 5.

be issued to a third-party).

The procedural rules governing forfeiture actually effectuate the implementation of this RICO criminal penalty with further enhanced enforcement provisions.[19]  After conviction, if the Government seeks a personal money judgment, as they have in this case, a court must determine the amount of money that the defendant will be ordered to pay.  In order to complete this task, the jury may be called upon to render a special verdict as to the extent of the interest or property subject to forfeiture.  FED. R. CRIM. P. 32.2(b)(1) & (4).  Once a court has made the finding as to the amount of the money judgment, it must enter a preliminary order of forfeiture setting forth the amount of any *in personam* money judgment against the defendant (and not against any specific asset), as was done in this case.[20]  *Id.* at 32.2(b)(2).  Upon the entry of a POF that has granted an *in personam* money judgment, as done here, the Government is authorized to conduct discovery to locate assets to satisfy the judgment, commence proceedings to determine third-party interest into assets, and can seek any condition

---

[19] FED. R. CRIM. P. 32.2 recognizes that different types of forfeiture judgments can be employed.  In one respect, a court can identify specific property that can be the subject of forfeiture and seized after a POF has been executed.  With a specific asset judgment, a court would have to satisfy itself that there is a requisite nexus between the property and the offense.  Another type of judgment is a personal judgment for a sum of money equal to the amount of money laundered.  Our discussion herein will focus on the money judgment component of the statute.

[20] Raul and Alex Salvagno stake the position that the courts do not have authority in RICO cases to grant non-specific, unlimited monetary judgments, which argument LAG joined at the conclusion of the June 12, 2006 Hearing.  The Salvagnos are relying upon an analysis expressed by the Eastern District of Pennsylvania that Congress did not authorize the entry of forfeiture judgments not specifically addressed to forfeiture of particular assets and unlimited by the size of a defendant's assets.  *United States v. Croce*, 334 F. Supp. 2d 781 (E.D. Pa. 2004); *see also United States v. Croce*, 345 F. Supp. 2d 492 (E.D. Pa. 2004) (upon reconsideration, the court remained "convinced of the fundamental soundness of [its] original opinion"); *United States v. Day*, 416 F. Supp. 2d 79, 91 (D.C. 2006).  The underlying rationale of *Croce* is that if the forfeiture statute does not specifically authorize non-specific money judgments, Rule 32.2(b)(1)'s reference to forfeiture money judgments could not imply such authority.  *United States v. Croce*, 334 F. Supp. 2d at 785, n.12 (noting that, although there are cases approving money judgment forfeitures, the Advisory Committee "took no position on the correctness of those rulings").  However, in the Second Circuit, whose rulings are controlling upon this Court, a money judgment was declared valid, and the Second Circuit has not retreated from that pronouncement.  *United States v. Robilotto*, 828 F.2d 940, 949 (2d Cir. 1987); *United States v. Hall*, 434 F.3d 42 (1st Cir. 2006) (citing *Robilotto* and other Circuits).  Moreover, pursuant to the RICO statute, § 1963, the Government is permitted to collect on a money judgment in the same way a plaintiff does in a civil case.  *United States v. Hall*, 434 F.3d at 59.  Pursuant to controlling precedent, the Court declines to follow the Salvagnos' posture that there is no valid and enforceable *in personam* judgment in this case.

reasonably necessary to preserve the property's value. *Id*. at 32.2(b)(3). Further, the Government can move to amend an existing POF to include property that is substitute property that qualifies for forfeiture under an applicable statute. *Id*. at 32.2(e)(1) & (2). In this case, that applicable statute is 18 U.S.C. § 1963(m).

Realizing that a defendant is being punished for a pattern of racketeering activity, and so long as the sentencing court finds by a preponderance of the evidence that the criminal conduct through which the proceeds were garnered was foreseeable to the defendant, the proceeds should form part of the forfeiture judgment. *United States v. Fruchter*, 411 F.3d 377, 383-84 (2d Cir. 2005). Obviously, the potential forfeitable property includes the proceeds received by the defendants from illegal activity. *United States v. Regan*, 858 F.2d at 119; *United States v. Marco*s, 1990 WL 26299, at *4 (S.D.N.Y. Mar. 6, 1990) (citing *Russello v. United States*, 464 U.S. 16, 28 (1983)). It also means that the POF is not just limited by § 1963(a) to specific properties but can include an interest that has been transferred to third parties. *United States v. Ginsburg*, 773 F.2d at 801 (holding that since it is an *in personam* proceeding, the Government's interest is not limited to what is left at the time of the conviction). Proceeds derived from conduct of which the defendant was acquitted can be counted as proceeds of racketeering as well. *United States v. Fruchter*, 411 F.3d at 383-84.

Since RICO forfeiture is a sanction against the individual, *in personam*, and not against a particular asset, the Government is not obligated to trace the path of illegal proceeds to identify the assets. *United States v. Robilotto*, 828 F.2d at 948-49; *see also United States v. Hall*, 434 F.3d at 59; *United States v. Marcos*, 1990 WL 26299, at *5. Yet, the Government must show some nexus to the property or proceeds derived from the racketeering activity. *United States v. Voigt*, 89 F.3d 1050, 1087

(3rd Cir. 1996)[21] ("[T]his means that the government must prove by a preponderance of the evidence that the property it seeks . . . in satisfaction of the amount of criminal forfeiture to which it is entitled has *some* nexus to the property 'involved in' the money laundering offense.") (emphasis in original). The aim of Congress is to recover all of the racketeer's ill-gotten gains but not to seize legitimately acquired property. *United States v. Porcelli*, 865 F.2d 1352, 1365 (2d Cir. 1989). To the extent that tainted funds are used to acquire new property, that new acquisition is also forfeitable. *Id*. However, it is incumbent upon the court to determine the extent of the defendant's interest in these "newly acquired" properties that he "would not have acquired or maintained 'but for' his fraudulent scheme . . . . [F]orfeiture under section 1963(a)(2)(D) . . . must be limited by the [] rule of proportionality." *Id*.; *see also United States v. Horak*, 833 F.2d at 1243.

However, if the Government seizes assets, in which a third-party may have an interest, there are procedures in place to determine both the defendant's and the third-party's interests. Once the Government has published a notice that property will be seized and eventually sold to satisfy a forfeiture judgment, the third-party may file a petition asserting her interest in the property to be forfeited. FED. R. CRIM. P. 32.2(c); 18 U.S.C. § 1963(l). Such ancillary proceeding is not required when the forfeiture consists of a money judgment. FED. R. CRIM. P. 32.2(c)(1). This ancillary proceeding is neither entitled to a jury review nor is it considered a part of the sentencing proceedings. 18 U.S.C. § 1963(l)(2); FED. R. CRIM. P. 32.2(c)(4). In the event an ancillary proceeding is held, proof may be presented, and if the petitioner establishes, by the preponderance of the evidence, her legal

---

[21] We note that *United States v. Voigt* concerns forfeiture pursuant to the money laundering statute. As noted by the Honorable Thomas J. McAvoy, then Chief United States District Judge, in *United States v. Miller*, 26 F. Supp. 2d 415 (N.D.N.Y. 1998), the forfeiture provisions in the RICO and money laundering statutes, 18 U.S.C. § 1963 and 21 U.S.C. § 853, respectively, are "so similar in both legislative history and statutory language as to warrant similar interpretation." 26 F. Supp. 2d at 432 (citations omitted). We agree with Judge McAvoy's keen observation that "courts have routinely relied upon the decisions interpreting" both statutes. *Id*.

interest in the property or that she is a bona fide purchaser for value of the right, title and interest in the

to be forfeited property and "reasonably without cause to believe that the property was subject to

forfeiture," the court may amend an order of forfeiture in accordance with its determinations and

account for the non-defendant's rights.  18 U.S.C. § 1963(l)(6); FED. R. CRIM. P. 32.2(c)(2).

As stated above, the Government is not limited by what proceeds are left at the end of the

conviction, or what remains as dissipated proceeds of the illegal activity.  *United States v. Marcos*,

1990 WL 26299, at *5 (citing *United States v. Ginsburg*, 773 F.2d at 801).  Section 1963(m) permits

the Government to secure substituted assets to satisfy a forfeiture judgment.  In order for the

Government to seize substituted assets, one of the following events **must** occur:

> If any of the property described in subsection (a), as a result of any act or omission of
> the defendant –
> (1) cannot be located upon the exercise of due diligence;
> (2) has been transferred or sold to, or deposited with, a third party;
> (3) has been placed beyond the jurisdiction of the court;
> (4) has been substantially diminished in value; or
> (5) has been commingled with other property which cannot be divided without
> difficulty;
> the court shall order the forfeiture of any other property of the defendant up to the value
> of any property described in paragraphs (1) through (5).

18 U.S.C. § 1963(m).

Substituted assets by their very nature are not connected to the racketeering activity.  *United States v.

Saccoccia ("Saccoccia II")*, 354 F.3d 9, 12-13 (1st Cir. 2003).  "[A]ssets do not become forfeitable as

substitute assets unless and until a court has determined that the requirements of [§ 1963(m)] have been

satisfied and a forfeiture order has been entered."  *United States v. Saccoccia ("Saccoccia I")*, 165 F.

Supp. 2d 103, 113 (D.R.I. 2001).  Stated another way, this category of assets does not come into play

in the forfeiture process until such time the Government can no longer trace assets as funds derived

directly from the RICO activity.  *United States v. Voigt*, 89 F.3d. at 1085; *Saccoccia I*, 165 F. Supp. 2d

-20-

at 109 ("[W]hile tainted assets are immediately forfeitable, 'substitute assets' do not become forfeitable until the Court determines that the requirements of subsection (m) are satisfied and an order of forfeiture is entered." (citation omitted)).  And, substituted assets can only be forfeited up to the value of the unavailable forfeited property or to fulfill the unpaid portion of the money judgment; it can only be  "equivalent in value to the potential forfeitable property, and not necessarily the precise property." *United States v. Regan*, 858 F.2d at 121 (discussing that only the partner's interest and not the entire partnership can be subject to a restraining order).  Generally, the provision to acquire substituted assets is invoked when there is a claim of commingled assets, with the operative scenario that it **cannot be divided without difficulty**.

In terms of commingled funds, and particularly as it may relate to the facts of our case, we find useful instruction from the Third Circuit's decision in *United States v. Voigt*, 89 F.3d 1079.  The issue therein is whether particular items bought with tainted funds are traceable to the money laundering activity.  In *Voigt*, two pieces of jewelry, which the Government wanted forfeited, had been purchased with funds from an account in which laundered proceeds had been commingled with other funds.  *Id.* at 1081.  The numerous intervening deposits and withdrawals into the defendant's account subsequent to the deposit of the tainted funds made it virtually impossible to say subsequently purchased jewelry was traceable to property involved in the money laundering scheme.  *Id.* at 1082 & 1087.  *Voigt* notes that the "forfeiture provision makes clear that the government is entitled only to property 'involved in' or 'traceable to' money laundering activity."  *Id.* at 1084 (citing *United States v. $448,342.85*, 969 F.2d 474, 476 (7th Cir. 1992) for the proposition that the Government is "entitled only to funds used in the offense, not the whole account into which such funds had been deposited").  Thus, in order to give meaning to the substituted asset provision, the Third Circuit ruled that "once a defendant has

commingled laundered funds with untainted funds – whether in a bank account or in a tattered suitcase – such that they 'cannot be divided without difficulty' . . . the government must satisfy its forfeiture judgment through the substitute asset provision . . . [which may be] any property, cash or merchandise, in satisfaction of the amount of the criminal forfeiture to which it is entitled." *Id*. at 1088.[22] Hence, all the more reason why the value of procuring a money judgment is enhanced.  Having a personal money judgment rather than a specific asset judgment militates against the needlesome task of tracing tainted assets and ameliorates the complications caused by commingled assets.  FED. R. CRIM. P. 32.2(b)(1). Additionally, a money judgment complements and boosts the panoply of statutory powers in that the Government can also invoke all of the rights granted a plaintiff in a civil case and pursue a more bountiful array of the defendant's assets rather than be relegated to specific assets or the relative constrictures of § 1963(a)(1).  *United States v. Hall*, 434 F.3d 42.

If the funds are indeed traceable to illegal activity, the purpose for which the funds may be used or the classification of the assets itself does not create any grave consternation to the Government's effort to confiscate that asset.  For example, the Government's quest to forfeit attorney fees in this case is neither impeded by any constitutional overtures nor does the authorizing forfeiture statute carve out an exception for such fees.  *United States v. Monsanto*, 491 U.S. 600 (1989).  The Supreme Court has made it ineluctably clear that the seizure of attorney fees is not an impermissible burden upon a defendant's Fifth and Sixth Amendment Rights inasmuch as a person may not be able to pay an

---

[22]  In rendering their decision, the Third Circuit relied upon an observation by the Seventh Circuit:
Bank accounts do not commit crimes; people do. It makes no sense to confiscate whatever balance happens to be in an account bearing a particular number, just because proceeds of crime once passed through that account . . . . An "account" is a name, a routing device like the address of a building; the money is the "property" [for purposes of the forfeiture statute].  Once we distinguish the money from its container, it also follows that the presence of one illegal dollar in an account does not taint the rest – as if the dollar obtained from [money laundering activity] were like a drop of ink falling into a glass of water.
*United States v. Voigt*, 89 F.3d at 1087 (quoting *United States v. $448,342.85*, 969 F.2d at 476).

attorney if the funds are taken away.  *Id*.  Proceeds from an illegal enterprise used to pay an attorney can be forfeited because "a defendant has no [Fifth] and Sixth Amendment right[s] to spend another person's money[, the Government's,] for services rendered by an attorney, even if funds are the only way that defendant will be able to retain the attorney of his choice."  *Caplin & Drysdale, Chartered v. United States*, 491 U.S. 617, 626 (1989); *see also United States v. Ginsburg*, 773 F.2d at 802 ("Every dollar that the racketeer derives from illicit activities on such items as food, entertainment, college tuition, and charity, is a dollar that should not have been available for [defendant] to spend for those purposes.").  Likewise, the Government has the right to seek forfeiture of a pension fund, whether that fund is traceable to the illegal activity or constitutes substituted assets.  Pursuant to § 1963(a)(1), a defendant's salary, bonuses, profit sharing, and pension plan may be forfeited if found to be acquired by or maintained in violation of § 1962.  *United States v. Horak*, 833 F.2d at 1243.  In *Horak*, the defendant was ordered to forfeit the corporation's contribution to his pension and profit sharing, however, the Seventh Circuit found that the defendant's salary and pension in its entirety may not be subject to forfeiture, but only that portion acquired or maintained through illegal activity.  *Id*.  Even Individual Retirement Accounts (IRA) sought by the Government as substituted assets are not shielded by ERISA from criminal forfeiture.  *United States v. Vondette*, 352 F.3d 772 (2d Cir. 2003) (upholding the issuance of a POF that sought forfeiture of an IRA Account as a substituted property).

>    B.  Application of the Law.

To recapitulate, the Government's initial overture to seize the $200,000 paid to LAG is postulated upon these funds being traceable as tainted funds.  And, at the Hearing held on June 12, 2006, appreciable effort and proof was on display in an attempt to persuade the Court, by the preponderance of the evidence, that indeed the source of these monies were derived directly or

indirectly from racketeering activity.  However, in considering the evidence presented, the Government was met with a fundamental obstacle – was the source of the tainted proceeds commingled with untainted funds at the initial stage of receipt?  Another, more detailed review supports the conclusion that the ultimate source for the attorney fees is commingled funds, and commingled at several levels before reaching the hands of LAG.

Although the Government could have sought significantly more predicate RICO acts which would have greatly enlarged the amount of the forfeiture judgment, it elected to proceed with only seventeen predicate acts (Hr'g Ex. Gov't-5) against Raul Salvagno, culminating in a Special Verdict and a POF authorizing an *in personam* money judgment in the amount of $1,707,156.40, even though at trial, it was concluded that approximately $21,595,589.42 was earned through apparent fraud, the foundation for the restitution aspect of the sentencing judgment.  The Government conceded that it is limited by the Special Verdict.  Hr'g Tr. at 168.  Inescapably then, the amount of this money judgment identifies what is deemed to be tainted funds in this case but also caps what can be forfeited from Raul Salvagno.  The tainted funds from these seventeen contracts were deposited into AAR's central operating account in various intervals during a seven-year duration along with approximately $40,000,000 of untainted funds.  Several of the sources of the untainted funds include contracts, which dealt with various lines of services provided by AAR other than asbestos removal and did not involve Analytical Labs, and credit loans from the bank.  In this respect, the tainted funds represent less than 4.5% of all proceeds that flowed through this operating account.  The proof establishes that thousands of transactions over this questionable period, including deposits on a vast number of business ventures and an avalanche of withdrawals to pay the operating expenses, cascaded their way through this account.  To distinguish a tainted dollar from an untainted dollar is virtually impossible.  The law does

not provide us with the benefit of casting the tainted dollar as a drop of ink being dropped into a clear class of water. *See supra* note 22. Even if we were to accept the Government's formula, which employs the total sum of the fraud at $21,595,589.42, to measure the extent of the tainted fund and compare that tally with the gross receipts of AAR, we still average approximately a 50% ratio between fraud receipts and untainted funds, which does not diminish the difficulty in tracing the tainted funds. Hr'g Exs. Gov't-1 & 3; *see* Dkt. No. 637, Gov't Lt.-Mem., dated June 22, 2006 (arguing that the $20,000,000+ was illegal funds and should not be calculated as "good money"). Moreover, the legal tussling during the Hearing over whether one or more of the predicate RICO contract deposits could be traced to payments to the employees' retirement account substantiates that tainted and untainted funds were commingled in the operating fund. Therefore, the initial source of the funds used to contribute to AAR's pension fund, of which Raul Salvagno was a participating member, is indistinguishable between tainted and untainted funds.

The Government made a gallant effort to show that monies from these seventeen predicate acts actually funded the contributions to AAR's pension fund in the amount of $262,807.28. *See* Hr'g Ex. Gov't-8. But under the light of cross examination of this proof, in addition to an inspection of several relevant bank statements marked as Exhibits, it was revealed that there is not a readily identifiable nexus between those tainted contract deposits of $1.7 million and the checks forwarded to Procter Group, the agency handling the company's pension fund. *See* Hr'g Exs. LAG-A-J. The financial traffic throughout this account over the record period makes it illogical to assume that the RICO funds were the bulwark of the payments to the pension fund. Dkt. No. 635, LAG's Lt.-Mem., dated June 16, 2006, at pp. 2-4. Much like the circumstances in *Voigt*, numerous intervening deposits and withdrawals into the AAR operating account prior and subsequent to the deposit of the tainted funds make it

virtually impossible to say that any one contribution into the company's pension fund is traceable to property involved in the RICO conspiracy.

We are aware that in 2001, Raul Salvagno's share of the company's retirement account reflected a balance of $228,228.24.  Hr'g Ex. Gov't-7.  If we were to accept, *arguendo*, that the tainted funds from the seventeen predicate acts are traceable into AAR's pension fund, we are still confronted with the notion of commingling of assets.  The evidence clearly establishes that prior to the RICO period, $30,000 of untainted funds were contributed into Raul Salvagno's employees' retirement account, which also yielded more than $5,000 in gains that very next year.  *See supra* Part I.D. & note 16.  This all occurred prior to any intimation that tainted funds were exploited to fund his pension.  To now delineate between the subsequent earnings on these untainted funds from the probable tainted funds that may have been contributed to Salvagno's pension and its corresponding earnings, without knowing the investment vehicles used during each ensuing year and the rate of returns on each, would require an actuary with more than a slide rule and lots of time on his hands.  By enacting § 1963(m), Congress precisely intended to insulate the courts from serving as either an actuary or accountant or to labor with a calculator in hand on these types of matters.  Evidently, the commingled funds at this stage cannot be divided without difficulty.

Raul Salvagno had several personal retirement accounts independent of AAR.  We know from the proof presented that he had a series of IRAs with Prudential Securities that began with $12,000, probably from earnings from his erstwhile employer, GE.  Hr'g Ex. Gov't-8.  We also know that he made at least a $2,000 annual contribution to the Prudential Securities with apparently untainted funds. By December 27, 2000, these IRA Accounts had grown to $44,512.12, which sum was transferred into his Morgan Stanley IRA Account.  Approximately six months later, on or about May 23, 2001, Raul

Salvagno transferred $159,542.05 from his company's retirement account to the same Morgan Stanley Account. By September 30, 2003, when one Morgan Stanley IRA Account was closed and another had been opened, it had amassed the sum of $269,552.46, and we can presume that at least $60,000 of it are gains and earnings. Our dilemma becomes this: how do we actually divide these earning between the Prudential Securities untainted funds and the Procter Group "mixed" funds, without, again, knowing the investments that each pension fund contributed to the Morgan Stanley Account, their respective rate of earnings, and without exercising voodoo math?[23]  Therefore, we cannot say with any relative certitude that the $200,000 withdrawn from the Morgan Stanley IRA Account and placed into Raul and Susan Salvagno's Wachovia Joint Checking Account, on June 28, 2004, was funded with traceable tainted funds, which can be calculated without extreme difficulty, or that these funds, at best, are not commingled assets. We are therefore compelled to find that the Government was unable to prove and trace, by the preponderance of the evidence, that the $200,000 paid to LAG was directly derived from illegal RICO activity. And it is for these very reasons that Congress enacted § 1963(m) – to allow the Government to secure substituted assets to satisfy the money judgment.

As observed earlier, the Government approached the seizure of the attorney fees in the alternative. The Government argues that if this Court were to find that these are not § 1963(a)

---

[23]  During the Hearing, the Court suggested to both parties the proposition that maybe we could use fractions to calculate both the earnings to be divided between the respective contributing funds and then divide the final balance of $269,552.46 into pools of tainted and untainted funds. (e.g. 44,512.12/204,054.17 x 60,000 = income and gains earned from Prudential Securities). The Court was weighing the proportionality analysis that could possibly be appropriate in this case. *United States v. Porcelli*, 865 F.2d 1352, 1364 (2d Cir.1989). On the record, the Government thought such proportionality was feasible and within the Court's providence to undertake such a mathematical exercise. LAG opposed this type of proportionality as being inappropriate. Dkt. No. 635, LAG's Lt.-Mem., dated June 16, 2006. Nonetheless, this overly simplistic math exercise completely ignores the commingling quandary created in the employer's retirement account with the $30,000 contribution made in 1994 and its corresponding earnings. It also neglects to consider the different and individual investments brought to the table by each of these funding sources. These types of math machinations are exactly the type of division difficulties § 1963(m) wants the courts to avoid, the element of proportionality notwithstanding. Thus, the Court will abandon this proposition.

proceeds, then they ask that the $200,000 paid to LAG in two installments on July 7, 2004, and September 21, 2004, and after the issuance of the POF, be considered substituted assets subject to forfeiture.  This aspect of the Government's Motion is met with various challenges by both LAG and Raul Salvagno.

The record indicates that within the Indictment there is a forfeiture allegation which includes a notice of possible forfeiture of substituted assets.  However, no specific assets, of any nature, is listed therein.  Dkt. No. 1.  After the conviction and a jury hearing, Senior District Judge Munson executed a POF on April 20, 2004.  Dkt. No. 324.  Rather than direct forfeiture of specific assets, or conversely, in lieu of such direction, the POF granted, *inter alia*, a money judgment against Raul Salvagno.  However, the money judgment would not become a *fait d'compli* until the date of sentencing.  No where within the POF is there any mention of substituted assets or their ultimate forfeiture.  The POF, in addition to available statutory provisions, gave the Government the right to seize specific assets, restrain specific assets in order to preserve them for eventual forfeiture, conduct discovery to locate and evaluate assets, start the collection process, commence ancillary proceedings to determine third-party interests and rights into specific forfeitable properties, and seek the substitution of assets if other traceable assets were inadequate to satisfy the judgment.  We know from the record that the Government did not exercise any of the rights afforded them either by statute or the POF until after the sentencing.  Without more, this POF does not equate to a freeze order on Defendants' assets.

The Government proclaims that the right to a money judgment, a prominent feature of the POF, not only serves as notice that property should not be transferred but also candidly places the Government in a more paramount standing in terms of gaining control of these substituted funds.  However, the POF citing the Government's right to a money judgment, and for that matter, a money

-28-

judgment in and of itself, is not a self-executing document.  Consider, if you will, that once the Government has a final money judgment, which in this Court's estimation and by the very terms of the POF would be issued at sentencing, such judgment would give the Government the same collection rights as a plaintiff in a civil case.  *United States v. Hall*, 434 F.3d 42, 59 (1st Cir. 2006).  Under the Federal Rules of Civil Procedure, the process to enforce a money judgment is through a writ of execution, unless a court directs otherwise; the procedure of such execution is governed by the "practice and procedure of the state in which the district court is held."  FED. R. CIV. P. 69(a).  Thus, even assuming that the money judgment was truly effective on the date the POF was issued as opposed to the date of final judgment at sentencing, the Government had an array of rights to employ, but they must undertake affirmative steps to employ such rights.  *See generally* N.Y.C.P.L.R. Art. 52, General Commentary by David D. Siegel (noting that Article 52 provides procedural mechanisms for the enforcement of money judgments including what property is available to satisfy a judgment and devices whereby such property can be reached).  Those rights would include, *inter alia*, a restraining order, garnishment, seizure of assets, and foreclosure of real property.  *Id.*  The trouble is that you cannot exert any of these rights until you execute upon a judgment.  *See generally* N.Y.C.P.L.R., Art. 52.  Therefore, until the judgment is entered, there is no lien and a plaintiff is not a judgment-creditor.  Unless a notice of levy is served upon a judgment debtor, for personal property, that judgment-debtor is not restrained to transfer property or pay his lawyers.  *See* N.Y.C.P.L.R. §§ 5201(b), (c), 5202(a), & 5232(a); Dkt. No. 522, Hr'g Tr., dated Mar. 31, 2005, at 37-44.  Under New York law, a judgment-creditor becomes a judgment-lien-creditor as to personal property only after execution is delivered to the sheriff.  *Don King Prod., Inc. v. Thomas*, 945 F.2d 529, 533 (2d Cir. 1991) (citing N.Y.C.P.L.R. § 5202(a) & *Corwin Consultants, Inc. v. Interpublic Group of Co., Inc*., 512 F.2d 605, 607 n.2 (2d Cir. 1975)).  However,

such transfers may be subject to the state's fraudulent conveyance laws.  *See* N.Y.C.P.L.R. § 5202(a)(1).  Nonetheless, since our record does not reflect that a judgment had been docketed and that a judgment execution had been delivered to a sheriff, the Government cannot be deemed a judgment-creditor.  *Id*.

The Government complains that Raul Salvagno, on July 7, 2004, only two months after the issuance of the POF, in naked dereliction of the POF that affirmatively provides for a money judgment against him, paid LAG $150,000, and then, on September 21, 2004, paid the balance of the retainer with an additional $50,000.  This complaint of transgressing the authority of the POF is also extended to LAG, whom they claim accepted the retainer and performed legal services knowing that monies paid to them was forfeitable.  In contrast, both the Salvagnos and LAG maintain that neither had knowledge of the terms of the POF.  The Salvagnos profess their ignorance of the POF's existence, even though they were represented by trial counsel at that time.  Similarly, LAG may have known about the POF - and the extent of this limited knowledge is even questioned by them – but they claim they had no suspicion that the fee paid to them would be subject to forfeiture.[24]  Attorneys Asche and Gioiella

---

[24] Throughout their attack on this Motion for Forfeiture, LAG has reproached the Government for not informing them prior to their representation of the Salvagnos through a lengthy sentencing process and the filing a notice of appeal on their behalf.  In assailing the Government's reticence or concealment of their intentions to forfeit the attorneys fees, LAG charges that the Government has a duty to at least inform them that their fees were being considered for forfeiture.  Had they known that possibility, they would never have accepted the responsibility of representing the Salvagnos and expended approximately 950 hours representing them.  Accordingly, LAG requests that the Court deny the Government's Motion for this reason.

With the exception of requiring the indictment to contain a forfeiture allegation and a judgment of forfeiture identifying specific assets to be forfeited, there are no additional provisions within the forfeiture statute or Rule 32.2 that obligate the Government to provide counsel with notice that a specific assets, much less attorney fees, will be forfeited.  We may agree with LAG that it would be a better policy if the Government did in fact inform attorneys prior to them assuming and then providing legal services on behalf of a client that their fees would be the subject of a forfeiture application.  Under that scenario, the attorneys can make an intelligent decision on whether they will proceed with representing a client knowing that their fees are in jeopardy.  With such prior notice, an attorney would have the option to elect not to accept the professional engagement and consume their time and talent on a cause that reaps no financial reward for such services, and alleviates, at least for them, further potential conflict of interest and consternation as that confronting LAG at this moment.  Notwithstanding LAG's appeal for relief based upon the alleged bad faith of the Government, this Court does not have authority to grant equitable relief in a matter such as this.  *Caplan & Drysdale Chartered v. United States*, 491 U.S. 617

asseverate that the first time they were apprised that their fees were imperiled was the filing of the Post-Conviction, Post-Forfeiture Restraining Order, on February 25, 2005, approximately six months after LAG filed a Notice of Appearance and after rendering 950 hours of legal service. Dkt. No. 426. On the other hand, under these circumstances, the Government contends that Defendants and Counsel were on notice of the forfeiture and thus their plea of ignorance is of limited help.

There can be no judgment of forfeiture unless the indictment "provides notice that the defendant has an interest in property that is subject to forfeiture in accordance with the applicable statute." FED. R. CRIM. P. 7(c)(2); *see also* FED. R. CRIM. P. 32.2(a). This does not require that the Government must have a substantive allegation describing the property to be forfeited. In our case, there are such forfeiture allegations within the Indictment, which includes a statement that substitute assets may be forfeited, but no specifics are provided. Dkt. No. 1, ¶¶ 226-30. Further, clearly stated within the POF is a money judgment in the amount to be forfeited by Raul Salvagno. It is therefore problematic for the Salvagnos and LAG to plead that they were unaware of the parameters of the forfeiture. A party has a "duty to monitor the progress of the litigation and to ascertain the terms of any order entered against the party." *Perfect Fit Indus. v. Acme Quilting Co. Inc.*, 646 F.2d 800, 808 (2d Cir. 1981). "[A] party to an action is not permitted to maintain, a studied ignorance of the terms of a decree in order to postpone compliance and preclude a finding of contempt." *Town of Islip v. Eastern Air Lines Inc.*, 793 F.2d 79, 84 (2d Cir. 1986) (quoting *Perfect Fit Indus.*). Therefore, LAG and the Salvagnos should have known that Raul Salvagno's property would be subject to forfeiture via the *in personam* money judgment. But, what confronts LAG and the Salvagnos, and now the Court, is the degree to which they should have known that Raul Salvagno's personal IRA Account, a substitute property, would be a target

(1989) (discussing the limitation of the court's discretion to immunize assets to be used for attorney fees).

of forfeiture.

Because the notice in the indictment is general and not specific, a party would not know that a specific asset, other than those tainted by the illegal actions, would be the subject of forfeiture until the conviction and the issuance of a POF.  A POF is required to identify the specific property subject to forfeiture, unless the Government seeks a personal money judgment.  FED. R. CRIM. P. 32.2(b)(1) & (2); *United States v. Saccoccia ("Saccoccia III")*, 58 F.3d 754 (1st Cir. 1995).  And a POF can be amended at any time to include specific property, including substituted assets, if all of the statutory conditions have been met.  FED. R. CRIM. P. 32.2(e)(1) ("[T]he Court may at any time enter an order forfeiture or amend an existing order of forfeiture to include [substitute] property[.]").  Presumably, the Government would first seek those assets traceable to the illegal activity because a party would be on notice that the assets derived directly or indirectly from racketeering activity shall be forfeited.  18 U.S.C. § 1963(a)(3).  When such traceable assets have been exhausted or deemed insufficient to satisfy the amount of the forfeiture, it is at that time that the Government can seek substituted assets, and not before.  18 U.S.C. § 1963(m); FED. R. CRIM P. 32.2(e)(1)(B); *Saccoccia I*, 165 F. Supp. 2d 103, 109 (D.R.I. 2001) ("If the defendant no longer posseses 'tainted' assets of sufficient value to satisfy a forfeiture judgement, § 1963(m) permits the Court to order the forfeiture of 'substitute' assets to the extent necessary to make up the deficiency.").  In seeking to forfeit a substituted asset, the Government must apply and the court may amend the POF to reflect that a specific substituted asset will be forfeited.[25]  In our case, the request for an amendment of the POF did not occur until after the $200,000 exchanged hands.  *A fortiori*, neither Salvagnos nor LAG would know that the substituted asset, the

_____

[25] All of these condition precedents and steps to seize substitute assets would not be necessary if the Government had a final money judgment which had been properly executed.  *See supra* at pp. 28-30.  Then, there would be no need to distinguish between tainted, commingled, and substitute assets since all of the judgment debtors would be available to satisfy the judgment.  N.Y.C.P.L.R. § 5201(a).

$200,000, would be the direct aim of the Government's efforts.  The Court agrees with LAG, notwithstanding the POF's granting a money judgment, without an execution of the money judgment, which again we do not believe has any force and effect until sentencing, or an order restraining the dissipation of the accounts from which this sum of money was withdrawn, Raul Salvagno was free to use this substituted asset in any matter he deemed appropriate.  To suggest that Raul Salvagno, after the April 20, 2004 POF, could not expend any of his money or dispose of any of his property that was not derived from racketeering activity in order to survive financially and pay daily living expenses and that he was required to sit upon all of his assets until the time of sentencing is somewhat absurd.  Until there is an execution on the substituted property by a civil judgment, an order restraining and preserving the asset, or an actual seizure of the asset, a defendant should be able to use those untainted assets to survive and meet his needs.  However, once a POF identifies the **specific** substituted property, by virtue of such notice, a party cannot disclaim that they were not on alert that the property they are about to receive will not be seized.  Also, at that time, the substituted asset may be restrained or frozen.  *United States v. Numisgroup Int'l Corp.*, 169 F. Supp. 2d 133, 137-39 (E.D.N.Y. 2001) (finding that a post-conviction restraint of substitute assets as collateral in anticipation of an order of **restitution** is not precluded by § 1963(d)(1)(A) (emphasis added)).

Juxtaposed to the Government's notice argument is their claim to all forfeitable assets at the time of the criminal violations as being superior to all others.  Essentially, the Government is relying upon the relations back doctrine to state that they have a greater property and title interest in the $200,000 than LAG.  Also, interchangeably, the right to restrain an asset to preserve it for forfeiture is premised upon the relations back doctrine as well.  *United States v. Regan*, 858 F.2d 115 (2d Cir. 1988).  Pursuant to the forfeiture statute,

> **All right, title, and interest in property described in subsection (a) vests in the United States upon the commission of the act giving rise to forfeiture under this section**.  Any such property that is subsequently transferred to a person other than the defendant may be the subject of a special verdict of forfeiture and thereafter shall be ordered forfeited to the United States, unless the transferee establishes in a hearing pursuant to subsection (l) that he is a bona fide purchaser for value of such property who at the time of purchase was reasonably without cause to believe that the property was subject to forfeiture under this section.

18 U.S.C. § 1963(c) (emphasis added).

Stated another way, all rights, title and interest in property obtained by illicit means as described in the statute "vests in the United States upon the commission of the act giving rise to the forfeiture." *Caplin & Drysdale v. United States*, 491 U.S. at 627 (noting that this is commonly known as the taint theory). Logically then, as proffered by the Government, they had a superior right to the $200,000 that vested at the time of the commission of the crime, which would have been as early as 1995, maybe earlier. LAG decries, however, that the logic is flawed in that we are not discussing an asset that is tainted, derived from predicate RICO acts, but a substituted asset.  Since substitute assets do not come into play in a forfeiture until such time tainted assets are unavailable, § 1963(m), the more sound reasoning, LAG argues, would be that the relation back doctrine set forth in § 1963(c) is not applicable to substitute property.  LAG rests their argument on the combined rationality of the Second Circuit case of *United States v. Gotti*, 155 F.3d 144 (2d Cir. 1998) and the First Circuit case of *Saccoccia I*, 165 F. Supp. 2d 103 (D.R.I. 2001), *reversed on other grounds*, *Saccoccia II*, 354 F.3d 9 (1st Cir. 2003).

*Gotti* dealt with the situation in which the Government sought to enforce a post-indictment, pretrial restraint of substitute assets, and the Second Circuit held that § 1963(d)(1)(A)[26] does not

---

[26]  This statute states, in part:
> Upon application of the United States, the court may enter a restraining order or injunction, require the execution of a satisfactory performance bond, or take any other action to preserve the availability of **property described in subsection (a)** for forfeiture under this section – upon the filing of an indictment or information charging a violation of section 1962 of this chapter and alleging that the property with respect to which the order is sought would, in the event of conviction, be subject to forfeiture under this

authorize such a pretrial restraint, and by so holding limited the scope of the holding in *United States*

*v. Regan*, 858 F.2d 115, to its individual facts.  *Id*. at 147.  Agreeing with the Third and Fifth Circuits,

the Second Circuit concluded that § 1963(d)(1)(A) "plainly states what property may be restrained

before trial.  Congress made specific reference to the property described in [subsection (a)], and that

description does not include substitute assets." *Id*. at 149 (alterations in original) (citation omitted).  A

similar rationale exists within this District.  The Honorable Thomas J. McAvoy, then Chief United

States District Judge, was asked by a defendant to release the pretrial seizure of substitute assets.

*United States v. Miller*, 26 F. Supp. 2d 415 (N.D.N.Y. 1998).  Noting that *Gotti* joined the majority

view held by the Third, Fifth, Eighth, and Ninth Circuits that pretrial restraints of substitute assets is

impermissible, *id.* at 431, the District Court acknowledged, much like the Second Circuit, that though

the "restraint of substitute assets might arguably serve the stated legislative purpose of preserving assets

for forfeiture upon conviction, the unambiguous language of [the RICO forfeiture statute,] 18 U.S.C.

§ 1963 (d)(1)(A) provides no authority for the restraints."  *Id*. at 432 (quoting *Gotti*, 155 F.3d at 150).[27]

Extrapolating upon the reasoning in *Gotti* and two other Circuits, District Judge McAvoy found that

substitute assets may not be seized before conviction, and the Government was directed to promptly

return the defendant's property.

        The rationale in *Gotti* and *Miller* is the linchpin of LAG's contention that the relation back

doctrine does not apply to substitute assets.  In their view, as clearly stated in the statute, the language

---

        section.
18 U.S.C. § 1963(d)(1)(A) (emphasis added).

        [27]  The Government in this instant case has made the same policy argument the Government made in *United States v. Razmilovic*, 419 F.3d 134 (2d Cir. 2005), and proffers that we should give accord to the same instruction provided therein. We hold steadfast that where the Government believes an enacting statute makes no sense in omitting a pretrial restraint provision, "the complaint [] should be addressed to Congress" and not to the court.  *Id*. at 141 (citing *United States v. Monsanto*, 491 U.S. at 614).

in §§ 1963(c) and (d)(1) are virtually, if not indeed, identical in that they are specifically restricted to the tainted assets set forth in § 1963(a), and exclude, by virtue of its plain meaning and implications, substitute assets.  We now turn to a case decided within the First Circuit, *United States v. Saccoccia I*, 165 F. Supp. 2d 103, in support of their contention, and which, in some respect, is on point.

The Saccoccias were convicted on different dates but Stephen Saccoccia was the last to be convicted on March 1993.  Thereafter, the Government sought to require attorneys engaged to represent the Saccoccias at various stages of the litigation to turn over money paid to them as counsel.  *Id*. at 105. Some of the fees were paid before the conviction and some post conviction, between March 1992 and February 23, 1995.  Approximately $254,985 was paid shortly after the conviction.  Payment of the fees varied substantially with some of the fees being paid with tainted money and other fees paid by untainted funds.  The Government sought the forfeiture of these fees pursuant to both § 1963(c) and (m).

Indistinguishable from the Government's tactics in our case, and their supporting arguments thereof to seize attorney fees, the Government in *Saccoccia I* claimed that the attorney fees were tainted assets as described in § 1963(a) and could be reached under § 1963(c).  When tainted assets have been transferred to a third-party, such as attorney fees, which is not exempt under § 1963(c), those assets remain forfeitable, unless that third-party can established that they are a bona fide purchaser without notice.  *Saccoccia I*, 165 F. Supp. 2d at 110.  The *Saccoccia* court found that those fees that were paid from "tainted" assets, § 1963(a) & (c) property, were forfeitable and that the attorneys were not able to establish to the court's satisfaction that they were *bona fide* purchasers.  *Id*. at 111-13.  However, there was a different ruling as to attorney fees that were paid from substitute assets, § 1963(m) assets, which "do not become forfeitable . . . until a court has determined that the requirements of subsection

-36-

(m) have been satisfied and a forfeiture order has been entered." *Id*. at 113.  Critical to our facts and circumstances, the *Saccoccia* court found that § 1963(m) does not have a relation back provision similar to § 1963(c), in essence, "untainted assets that are transferred to a [bona fide purchaser, attorneys], do not become retroactively forfeitable . . . ." *Id*.  Identical to our case, an order forfeiting the substitute asset, the attorney fees, was entered long after (approximately nine months) the fees were paid from untainted funds, and thus were not forfeitable under § 1963(m).  *Id*.  These post conviction legal fees were not subject to forfeiture.  Lastly, and tangentially covering another issue in our case, the court found that the mere fact that a protective order was issued does not make a property forfeitable even though a transfer of the property was made in contravention of the protective order.  *Id*. at 113-14.

*Saccoccia I* was appealed and related issues were considered by two independent panels of the First Circuit.  In the first appellate review, the First Circuit rendered a discerning ruling, which is pertinent to our litigation.  The attorneys in *Saccoccia I* had expended the attorney fees paid to them.  The Government wanted those attorneys to forfeit the amount received by them, consummation of the fee notwithstanding.  With acute and piercing reasoning, the First Circuit first found that there is an "implicit limitation of 1963(m) – the 'substitute assets' provision, [which is exclusively applicable to any other property of the defendant] - that the government may reach only the defendant's substitute assets and not those of a third party[.]  Forfeiture is an *in personam* criminal remedy, targeted primarily at the defendant[.]"  *Saccoccia II*, 354 F.3d 9, 15 (1st Cir. 2003).  The statutory language of § 1963(m) "does not afford an avenue through which the government may reach a third party's untainted assets as a substitute for tainted assets which the third party had already transferred prior to the date of [the]

forfeiture [order]." *Id.* at 13.[28]  Weighing other related issues, the First Circuit confirmed its ruling in *Saccoccia II*, that § 1963(m) did not afford the Government the right to reach a third party's untainted assets once the defendant's substitute assets that were transferred to them had been expended. *United States v. Saccoccia ("Saccoccia IV")*, 433 F.3d 19, 26 (1st Cir. 2005).  In reversing the District Court's finding that the attorneys violated the restraining protective order, the First Circuit found that the protective order did not clearly and unambiguously enjoin the attorneys from accepting the attorney fees. *Id.* at 21.

We find all of the *Saccoccia* cases persuasive in several material respects as to our case.  First, the *Saccoccia* cases confirm an expansive reasoning of *Gotti*, that there is no relation back doctrine applicable to substitute assets.  Not until such time that a court finds that the elements of § 1963(m) have been met and an order of forfeiture has been granted will the Government have superior rights to substitute assets.  Hence, we disagree with the Government that by virtue of the relation back doctrine they had superior rights over LAG to the $200,000.  They did not.  In support of their contention that the relation back doctrine is controlling even for substitute property, the Government cites *United States v. McHan*, 345 F.3d 262 (4th Cir. 2003).  The Fourth and First Circuits hold diametrically opposite views on this legal axiom.  We respectfully decline to follow *McHan*, as we find the First Circuit ruling in *Saccoccia*, combined with the Second Circuit rationale in *Gotti*, to be the more correct critique of this issue.  There is no applicable relation back doctrine here, and coincidentally, LAG is not classified

---

[28]  *Saccoccia II* continued to state that the Government was not without any remedy against the attorneys if they could prove that they knew that the transfer of funds to them was made in violation of the order of protection.  If established, the Government could pursue contempt and conversion actions against them.  354 F.3d at 14-15.

as a bona fide purchaser as so defined in § 1963(c).[29]

Second, we further find that neither the Indictment nor the POF gave LAG notice that this $200,000 fee would be forfeited.  If a forfeiture order addressed to this specific substitute asset had been issued prior to LAG receiving and expending the sum, the Government would be in much greater stead and able to seize the balance of these proceeds, if not the entire amount.  We agree with LAG that the Government had a number of tools available to them, which could have put LAG on proper notice that the fees they had received would have been forfeited or estopped them from consuming the funds by rendering legal services.  These tools were never employed until the Post-Conviction, Post-Forfeiture Restraining Order of February 25, 2005, presumably after the money had already been expended.  The POF gave the Government the right to depose the Salvagnos to locate assets, the ability to seek a restraining and preservation order once discovered, and to amend the POF to include the substitute assets as forfeitable assets.  So too does Rule 32.2(b).  If the money judgment was in effect as expressly granted in the POF, which we do not find for reasons stated above, there were a host of other rights of execution afforded to the Government, which they did not attempt to utilize.[30]  We find that there was no specific legal notice in effect at the time Raul Salvagno paid LAG the retainer from substitute assets, which proper and timely notice would have given the Government the legal right to forfeit these funds.

Related to the matter of notices and timely implementing one or more of their legal arsenal to

---

[29]  Because we have found above that the $200,000 is not tainted assets but substitute assets, and in light of the fact that § 1963(c) is not applicable to substitute assets, we need not analyze further whether LAG would be a bona fide purchaser for value, and had reasonable cause to believe that the property was forfeitable.  As we now know, § 1963(c) only applies to § 1963(a) property – tainted assets.

[30]  The money judgment would not have final force and effect until the sentencing, which occurred in December 2004, months after LAG had received the retainer and commenced defending the Salvagnos.

restrain this substitute assets, the record indicates that the Government first had notice of the Morgan Stanley IRA Account as early as June 2004, one month prior to the first retainer check. A financial statement, dated April 5, 2004, was submitted to the Court and the Government to facilitate the bail/release analysis that there was property in existence that could provide collateral for the post-conviction, pre-sentencing security bond of $1,000,000. *See* Hr'g Tr. at 140-42 & 144-58, Ex. Salvagno-A-1, Fin. Statement, dated Apr. 5, 2004. Clearly noted within the financial statement, accompanied by an attached account summary, is the Morgan Stanley account with a corpus of approximately $287,446. Additionally, Raul Salvagno submitted to probation, of which the Government received a copy, another financial affidavit that noted that there existed a personal retirement account and that monies were paid to LAG. Having been alerted to the fact that two potential substitute assets existed, prior to LAG laboring full bore on behalf of the Salvagnos, the Government was in the position of gaining a restraining order and/or an amended POF. Unfortunately for the Government, they did not.

Third, we also conclude that the substitute asset of $200,000 was indeed consumed or expended by LAG. LAG has repeatedly represented that they had expended 950 hours representing the Salvagnos during sentencing and filing an appeal, literally depleting the entire retainer. Even if we were to discount the credulity of their proffer, the record clearly demonstrates that they assumed their legal role in July 2004, prepared and submitted voluminous legal sentencing memoranda, in all likelihood reviewed the extensive pleading and trial record of six months, participated in a sentencing hearing that exhausted sixteen days, and filed a notice of appeal and an affidavit with the Second Circuit. Under the most conservative interpretation, LAG generated a significant block of hours which could

reasonably be perceived as depleting the $200,000 retainer fee.[31]   Accordingly, we find that the

substituted asset of $200,000 was expended, and that LAG does not have to use their own untainted,

substitute assets to replenish the $200,000.[32]

Relying heavily upon *United States v. All Funds on Deposit in Dime Savings Bank of*

*Williamsburg Account No. 58-400738-1 in the Name of Ishar Abdi and Barbara Abdi*, 255 F. Supp. 2d

56 (E.D.N.Y. 2003), the Government, we believe, is asserting that when Raul Salvagno transferred

funds from his employee's retirement account, knowing that some of the proceeds came from illegal

activity, into his personal IRA account and then into his Joint Checking Account with his wife, he was

attempting to conceal the true nature of the funds and thus engaged in money laundering.  In essence

he was pooling the funds to facilitate the disguising of the nature of this scheme.  Without participating

in a detailed analysis of whether Raul Salvagno or even LAG may have engaged in further money

laundering, we succinctly state that the Government failed to prove such venture by the preponderance

---

[31] Asche and Gioiella proffer that their going rate is approximately $350 per hour, which is this Court's belief to be the fair and reasonable rate charged by criminal practitioners in the New York City region.  In a retainer agreement between Raul Salvagno and LAG, the hourly rate discussed was $500 per hour.  Hr'g Ex. Gov't-10, Retainer Agreement, dated July 5, 2004.  We should also factor in additional costs such as transportation, lodging, stenographers, and witness and expert fees.

[32] This Court was truly curious why the Government did not attempt to forfeit counsel fees paid to trial counsel David Bernfeld and Emile Rossi, and the cadre of other lawyers prior to LAG being retained.  In some respect, the Government probably could have been more successful in retrieving these funds from them in that the funds could have been traceable to tainted assets.  Or, they could have been confronted with the same quandary that their fees were paid from substituted assets.

In responding, the Government took the position that there should be some prosecutorial discretion to determine what fees should be confiscated.  Presumably that prosecutorial discretion is supported by legal authority.  18 U.S.C. § 1963(g)(2).  Furthermore, the Government, at least in this District, distinguishes between counsel fees paid pre-conviction, where notice of forfeiture is tenuous, and post-conviction, where notice of forfeiture is unavoidable.  We submit that the underpinning of this policy is unsymmetrical and inconsistent, which would lead to arbitrary and inequitable treatment, albeit currently lawful.

of the evidence.[33]

### III.  CONCLUSION

Based upon all of the foregoing, we find that the Government failed to meet its burden and that the $200,000 attorney fees was not drawn from tainted funds subject to forfeiture pursuant to the POF. We further find that the $200,000 constitutes substitute property, in which the Government does not have a superior right over and above LAG, and that the POF did not provide appropriate notice that these attorney fees would be forfeited.  Since the retainer of $200,000 has been expended for value, by rendering legal services commencing in July 2004, and prior to the Post-Conviction, Post-Forfeiture Restraining Order, LAG does not have to spend its substituted assets to satisfy the Forfeiture Judgment.[34]

---

[33]  Apparently, the Government also asks us to consider this case for the proposition that they do not have to prove that untainted funds were involved, or that the funds used in the transaction were exclusively derived from the racketeering activity. *All Funds*, 255 F. Supp. 2d at 68.  We accept the proposition that their burden is not that extreme.

[34]  The Salvagnos have argued that if LAG is allowed to retain the attorney fees, a portion of that money may be due them. It is their view that the retainer was divided into two components: (1) sentencing, and (2) appeal.  Because an appeal process has not occurred, since this case was remanded for a re-sentencing, only one half, $100,000, was rightfully spent on defending them during sentencing.  Thus, the remaining balance of $100,000 should be returned to them. *See* Hr'g Ex. Gov't-10, Raul Salvagno's Lt., dated Apr. 5, 2006.  A contrary perspective has been noted by LAG in that they believe the entire retainer of $200,000 has been expended and indeed they could be owed more.  Or, LAG believes that they are entitled to the entire retainer in that they filed a Notice of Appeal on the Salvagnos' behalf, meeting all of the terms of the retainer agreement. *Id.*, LAG's Lt., dated May 1, 2006, with attached retainer agreements.  We suspect that the Salvagnos believe that this Report-Recommendation and Order would resolve these issues.  It does not for two obvious reasons.  First, such determination was not directed by Senior Judge Munson's referral order.  Second, such a matter is a contract matter, not a criminal matter nor a forfeiture issue, and the proper forum for such disagreement over the retainer contract is a civil proceeding, which conspicuously this proceeding is not.  Therefore a resolution of this particular issue remains outstanding.

However, it appears that under no scenario could the Salvagnos recover any of the retainer.  First, because the Government has a Post-Convict, Post-Forfeiture Restraining Order with direction to LAG to pay the  monies – the balance if any – to the Government, it would take precedent over any rights the Salvagnos may think that they have in the $100,000. Second, if the Salvagnos were to gain possession of this sum of money, weighing the filing of the Post-Conviction, Post-Forfeiture Restraining Order, any subsequent attorney who was considering entering this case is now on notice of forfeiture of attorney fees.  Third, if the monies were to fall within the Salvagnos' hands, the Government could, and probably would, ask for another amended judgment or execute upon its civil money judgment.  Their holding out hope of receiving this sum is all in vain.

On July 13, 2006, it appears that Raul Salvagno  filed a Petition for a Writ of Mandamus with the Second Circuit,

**WHEREFORE**, based on the foregoing, it is hereby

**RECOMMENDED**, that the Government's Motion to Forfeit (Dkt. No. 531) be **denied**; and it is further

**RECOMMENDED**, that the Post-Conviction, Post-Forfeiture Order (Dkt. No. 426) be **vacated**; and it is further

**ORDERED**, that the Clerk of the Court serve a copy of this Report-Recommendation and Order, by regular mail, upon the parties to this action.  The Clerk shall ensure that copies of this Report-Recommendation are sent to Raul and Alex Salvagno at the addresses indicated in the caption above.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have ten (10) days within which to file written objections to the foregoing report.  Such objections shall be filed with the Clerk of the Court. __FAILURE TO OBJECT TO THIS REPORT WITHIN TEN (10) DAYS WILL PRECLUDE APPELLATE REVIEW.__  *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989)); *see also* 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72(b), 6(a), & 6(e).

Albany, New York
July 21, 2006

RANDOLPH F. TREECE
United States Magistrate Judge

---

asking the Circuit Court to enjoin Senior Judge Munson from conducting his re-sentencing on September 13, 2006, until such time the issue of Forfeiture has been decided.  *See* Dkt. Nos. 650, Order, dated Jun. 30, 2006, & 653, Pet. for Writ of Mandamus.  Such Petition has been forwarded to the Second Circuit.  Dkt. No. 654.  As previously noted, whether a decision on this Motion of Forfeiture is a condition precedent before re-sentencing can be imposed will not be of any great consequence and, in all likelihood is moot, since this Report-Recommendation and Order is being issued significantly prior to the re-sentencing.

## ATTACHMENT A
## RELEVANT DOCKETS AND CHRONOLOGY PERTAINING TO FORFEITURE ISSUE

| DATE | DOCKET NUMBER | DESCRIPTION OF DOCUMENT |
|------|---------------|-------------------------|
| 3/30/04 | Dkt. 306 | After guilty verdict, Judge Munson charges jury as to Special Verdict pertaining to Forfeiture.  Jury returns a Special Verdict finding the following forfeitures:  Alex Salvagno ($2,033,457.70), Raul Salvagno ($1,707,156.40), AAR Contracting ($2,033,457.70). |
| 4/16/04 | Dkt. 320 | Jury Notes, Verdict Sheet, and Special Verdict as to the Salvagnos. |
| 4/20/04 | Dkt. 324 | Judge Munson issues Preliminary Order Directing Forfeiture of property as to Alex and Raul Salvagno (Document is signed on 4/20/04, though not docketed until 5/11/04). |
| 10/1/04 | Dkt. 357 | Order regarding Forfeiture as to Alex and Raul Salvagno. |
| 12/23/04 | Dkt. 403 | Sentencing of Raul Salvagno to imprisonment of 235 months and Forfeiture of $1,707,156.40. |
| 1/28/05 | Dkt. 404 | Judgment of Conviction as to Raul Salvagno. |
| 2/11/05 | Dkt. 422 | Amended Judgement: Forfeiture of $1,707,156.40. |
| 2/25/05 | Dkt. 425 | US *Ex Parte* Application for Post-Conviction, Post-Forfeiture Restraining Order (originally filed under seal on 2/25/05, but then ordered unsealed on 3/1/05–Dkt. No. 431). |
| 2/25/05 | Dkt. 426 | Post-Conviction, Post-Forfeiture Restraining Order pertaining to the fees paid to Litman, Asche, & Gioiella (LAG) (Document is signed on 2/25/05, though not docketed until 2/28/05). |
| 3/1/05 | Dkt. 431 | Order to unseal the Government's *Ex Parte* Application for the Post-Conviction, Post-Forfeiture Restraining Order. |
| 3/4/05 | Dkt. 432 | Scheduling Order (briefing schedule) on Post-Conviction, Post-Forfeiture Restraining Order. |
| 3/4/05 | Dkt. 433 | Order setting March 18, 2005 for Alex and Raul Salvagno to supply sworn financial disclosure regarding all attorney fees paid after April 20, 2004. |
| 3/18/05 | Dkt. 435 | Notice of Appearance by AUSA Thomas A. Capezza as co-counsel for criminal forfeiture aspect of case. |

| *DATE* | *DOCKET NUMBER* | *DESCRIPTION OF DOCUMENT* |
|---|---|---|
| **3/21/05** | **Dkt. 436** | Letter from Thomas Capezza requesting extension of time to file Reply Brief in Opposition to Restraining Order. |
| **3/21/05** | **Dkt. 437** | LAG Memorandum of Law in Opposition to Post-Conviction, Post-Forfeiture Restraining Order (Document dated 3/18/05, though not docketed until 3/21/05–Another, possibly duplicate, LAG Memorandum of Law, also dated 3/18/05, was docketed on 3/23/05 as Dkt. No. 438). |
| **3/28/05** | **Dkt. 439** | Sealed Government's Response to Opposition to Forfeiture and Seizure of Attorney's Fees. |
| **3/28/05** | **Dkt. 440** | Order sealing Government's Response to Opposition to Forfeiture and Seizure of Attorney's Fees. |
| **3/31/05** | **Dkt. 445** | LAG Reply-Memorandum regarding Forfeiture and Seizure of Attorney's Fees. |
| **3/31/05** | **Dkt. 522** | Transcript of Court Proceedings regarding Restraining Order, held before Senior District Judge Munson on 3/31/05 (docketed on 7/21/05). |
| **6/1/05** | **Dkt. 511** | Letter from AUSA Craig Benedict regarding Attorney Fee Forfeiture and requesting review of new case. |
| **11/23/05** | **Dkt. 531** | Government's Motion for Forfeiture of Property. |
| **1/4/06** | **Dkt. 537** | *Pro se* Motion to hold Forfeiture Motion Hearing in abeyance until the Conflict of Interest issue between Salvagnos and attorneys is decided. |
| **2/2/06** | **Dkt. 557** | Minute Entry for Proceedings held before Senior District Judge Munson regarding *pro se* request to hold Motion for Forfeiture Hearing in abeyance - Court Reserves Decision. |
| **2/10/06** | **Dkt. 573** | Order referring to Magistrate Judge Lowe for a Report-Recommendation the conflict and forfeiture issues. |
| **2/22/06** | **Dkt. 575** | Order referring/reassigning to Magistrate Judge Treece for a Report-Recommendation the conflict and forfeiture issues. |
| **2/24/06** | **Dkt. 579 & 580** | LAG's Memorandum of Law and Affidavit in Opposition to Motion for Forfeiture of Attorney Fees (Dkt. No. 531). |
| **3/1/06** | **Dkt. 585** | Letter from AUSA Thomas Capezza as to Raul Salvagno requesting extension of time to reply to LAG's Response to Government's Motion to Forfeit $200,000. |

| *DATE* | *DOCKET NUMBER* | *DESCRIPTION OF DOCUMENT* |
|---|---|---|
| **3/1/06** | **Dkt. 586** | Letter from AUSA Thomas Capezza requesting extension to file Reply Papers**.** |
| **3/2/06** | **Dkt. 587** | Order granting AUSA Capezza's Request. Reply due by 3/13/2006 Signed by Judge Treece. |
| **3/13/06** | **Dkt. 590** | Government's Reply to Opposition to Motion for Forfeiture of Attorney Fees. |
| **3/21/06** | **Dkt. 599** | Government's Lt.-Brief addressing Conflict of Interest Issue and providing a chronology of events. |
| **4/24/06** | **Dkt. 615** | LAG's Rebuttal Memorandum to the Motion for Forfeiture. |
| **5/4/06** | **Dkt. 620** | Government's Response to LAG's Rebuttal Memorandum. |
| **5/26/06** | **Dkt. 630** | Order setting the Forfeiture Hearing for June 12, 2006, before Judge Treece. |
| **6/16/06** | **Dkt. 635** | LAG's Post-Hearing Memorandum. |
| **6/22/06** | **Dkt. 637** | Government's Post-Hearing Reply Memorandum. |

**ATTACHMENT B**
**FORFEITURE HEARING EXHIBITS**

**1.  THE GOVERNMENT**

| *EXHIBITS* | *DESCRIPTION* |
|---|---|
| 1 | Guideline Fraud Figures for the years 1991 through February 1999. |
| 2 | AAR Projects for the years 1991 through 1999. |
| 3 | Analysis of Deposits to AAR Operating Account Fleet Bank Account # 63x-xxxx651. |
| 4 | Restitution Judgments for Alex and Raul Salvagno. |
| 5 | Flow Chart of the nineteen projects that were the basis of RICO convictions and the relationships with deposits made into AAR Operating Account Fleet Bank Account #63x-xxx651. |
| 6 | The nineteen projects and deposits into the AAR Operating Account. |
| 7 | Schedule of Raul Salvagno's Retirement Account with AAR. |
| 8 | Flow Chart of funds deposited into Raul Salvagno's Morgan Stanley IRA Account #44x-xxx967, which in turn was deposited in a Wachovia Joint Checking Account, #11xxxxxxxx891. |
| 9 | Case Docket reflecting the Jury's Verdict and the Preliminary Order Directing Forfeiture of Property. |
| 10 | A series of letters relevant to Raul Salvagno and the Forfeiture Litigation. |
| 11-15 | Marked for Identification only – Annual Reports for AAR Retirement Plan for 1994 to 1998. |
| 16 | Special Verdict Form. |
| 17 | Schedule of Deposits for AAR. |

## 2.  LITMAN, ASCHE, & GIOIELLA, LLP

| EXHIBITS | DESCRIPTION |
|---|---|
| A | Jury Verdict Sheet. |
| B | AAR Fleet Account, Itemized Category Report for 7/1/95 through 12/31/95, and Employee Benefit Expense as of 6/30/95. |
| C | AAR Bank Statement for 1/01/97 to 1/31/97. |
| D | Copy of AAR Check to Trustco Bank Escrow Agent for MBM Trust in the amount of $8,873.86. |
| E | Copy of AAR Check to Bear Stearns in the amount of $34,226.14. |
| F | AAR Bank Statement for 1/1/98 to 1/30/98. |
| G | Copy of three AAR Checks to Albany Escrow Agent ($15,000), Bear Stearns ($21,219.23), and Albany Escrow Agent for SKG Trust ($10,000). |
| H | AAR Bank Statement for 1/1/99 to 1/29/99. |
| I | Copy of AAR Check to Bear Stearns in the amount of $44,000. |
| J | AAR Bank Statement for 2/27/99 to 3/31/99. |

## 3.  ALEX AND RAUL SALVAGNO

| EXHIBITS | DESCRIPTION |
|---|---|
| A-1 | Raul Salvagno's Financial Statement, dated 4/5/04, submitted during his request to be released on bail. |