UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

                              Plaintiff,

        -against-                                        5:02-CR-51 (LEK)

ALEXANDER SALVAGNO,

                              Defendant.

_____

## MEMORANDUM-DECISION AND ORDER

## I.      INTRODUCTION

        Before the Court is the Government's motion to reconsider the Court's April 23

Memorandum-Decision and Order granting Alexander Salvagno's motion requesting

compassionate release under 18 U.S.C. § 3582(c)(1)(A) in light of his high risk of contracting a

severe or deadly case of COVID-19. Dkt. Nos. 1162-1 ("Motion for Compassionate Release");

1166 ("April 23 Memorandum-Decision and Order"); 1168 ("Motion for Reconsideration").

Defendant filed a response to the Motion for Reconsideration, Dkt. No. 1179 ("Response"), and

the Government filed a reply, Dkt. No. 1180 ("Reply"). Salvagno is 53 years old and has

hypertension, for which he takes Lisinopril. He previously was serving his sentence at Danbury

Federal Correctional Institute ("FCI Danbury"), which has experienced a significant outbreak of

COVID-19 and which houses inmates in a dormitory-style setting that precludes social

distancing.

        For the reasons that follow, the Court considers much of the Government's new evidence

and arguments and denies the Government's Motion for Reconsideration.

## II.    BACKGROUND

### A.  Salvagno's Sentence and Request for Compassionate Release

Alexander Salvagno was sentenced to 25 years in prison in 2005 for a variety of offenses, including Racketeering Conspiracy, violations of the Clean Air Act, and Income Tax Evasion, in connection with an asbestos abatement fraud scheme. See Apr. 23 Mem.-Decision and Order at 1–2. His projected release date was July 30, 2026. Id.

On April 6, 2020, Salvagno requested compassionate release in light of his hypertension and the rapid spread of COVID-19 within FCI Danbury. Mot. for Compassionate Release at 2–4.[1] He asserted that he lived with a large number of inmates in a relatively small communal housing unit. Id. He also asserted that four inmates in his unit had recently tested positive for COVID-19 and that his unit had been placed on quarantine a week prior. Id. at 2–3. He noted further that the number of reported cases in the facility as a whole had increased significantly over the prior week. Id. at 3.

In a response submitted on April 9, the Government argued: (1) that Salvagno had failed to exhaust administrative remedies as required by 18 U.S.C. § 3582(c)(1)(A); and (2) that Salvagno had not presented an "extraordinary and compelling reason" to support release, see § 3582(c)(1)(A)(i), as neither the general background circumstances of the pandemic nor the conditions at FCI Danbury fulfilled that requirement. Dkt. No. 1163 at 2. Relatedly, its in April 9 response, the Government cast doubt on the veracity of Salvagno's representations about his

---

[1]  The page numbers cited for Salvagno's Motion for Compassionate Release and his April 10 reply to the Government's response to his Motion for Compassionate Release refer to the page numbers generated by ECF. Cited page numbers for all other filings refer to those provided in the documents themselves.

personal health, as Salvagno did not submit medical records with his initial motion. Id. at 3. But, the Government did not address the implications of Salvagno's hypertension under the "extraordinary and compelling reasons" analysis. Id. at 2–3. On April 10, Salvagno submitted a reply. Dkt. No. 1164-1. In that reply, Salvagno asserted that current Bureau of Prisons ("BOP") records documented his hypertension diagnosis and Lisinopril prescription. Id. at 4. On April 22, the Court received current BOP medical records that confirmed that, as of April 2020, Salvagno had hypertension and that he took Lisinopril, an ACE inhibitor, to treat the condition. Dkt. No. 1160-2.

**B.  The April 23 Memorandum-Decision and Order**

On April 23, the Court issued an order granting Salvagno's Motion for Compassionate Release. See generally Apr. 23 Mem.-Decision and Order. The Court first addressed the issue of exhaustion. The Court found that Salvagno's medical condition, combined with unusually dire circumstances at FCI Danbury, rendered exhaustion futile, as the risk of illness and death from COVID-19 that Salvagno sought to avoid via compassionate release was likely to materialize while he waited for the administrative process to unfold. Id. at 9–11. The Court found that requiring exhaustion under such circumstances contravened Congressional intent, as Congress passed the First Step Act to mitigate administrative delays that undermined effective relief in urgent circumstances. Id. at 7–9.

The Court further determined that Salvagno's individual circumstances supplied an "extraordinary and compelling reason" for release under 18 U.S.C. § 3582(c)(1)(A)(i). The Court based that finding on the following four considerations: (1) Salvango's hypertension increased his risk of severe illness or death from COVID; (2) there was a risk that Salvagno's ACE

3

inhibitor medication increased his likelihood of infection; (3) there was a significant COVID-19 outbreak at FCI Danbury; and (4) features of FCI Danbury's internal layout inhibited social distancing. Id. at 11–14.

The Court then considered relevant factors under 18 U.S.C. §§ 3553 and 3142(g), as required by § 3582(c)(1)(A). Id. at 14–16. The Court noted that Salvagno's crimes were serious and that for this reason his sentence was warranted under § 3553 at the time of its imposition. Id. at 14. But, the Court noted, Salvagno had no prior criminal history, and given the risk to his health posed by continued incarceration, additional prison time would be greater than necessary to advance the purposes of sentencing. Id. at 14–16. The Court also noted that Salvagno's crimes, while serious, were not violent, which reduced his danger to the community. Id. The Court further found that Salvagno had a viable re-entry plan, having secured both a residence and a promise of future lawful employment, and that this reduced his likelihood of recidivism and mitigated the danger he might otherwise pose to the community. Id.

### C.  The Government's Motion for Reconsideration

On May 7, the Government filed its Motion for Reconsideration. The Government argues that the Court: (1) made a clear error of law by waiving exhaustion, Mot. for Recons. at 9–14; (2) made a clear error of fact in finding that Salvagno was at risk of severe illness or death from COVID-19, id. at 5–7; (3) made a clear error of fact in finding that conditions at FCI Danbury are dire, in light of mitigative measures BOP has taken, id. at 4, 7– 9; (4) made a clear error of law in finding that hypertension, in combination with the risk of contagion at FCI Danbury, constitutes an "extraordinary and compelling reason" for release, id. at 5 n.5, 9; and (5) made an error of law in releasing Salvagno with roughly six years remaining until his projected release date, id. at 5

4

n.5.

In support of its motion, the Government offers the following evidence: (1) BOP medical

records dating back several years, Dkt. No. 1173 ("Medical Records"); (2) a declaration from Dr.

Bardes, a doctor of general internal medicine outside of the BOP system, who, upon reviewing

these medicals records, asserts that Salvagno's hypertension is "mild" and "controlled," that he

does not have "pulmonary hypertension," and that hypertension does not place Salvagno at

greater risk of severe illness from COVID-19 than other inmates, Dkt. No. 1168-2 ("Bardes

Declaration"); (3) new scientific research indicating that ACE inhibitors do not increase the

likelihood of SARS-CoV-2 infection or severe illness from COVID-19, Mot. for Recons. at 6;

Bardes. Decl. ¶¶ 7(c)–(d), 8(c); and (4) a summary of steps BOP has taken to mitigate the threat

of COVID-19 within federal prisons in general and at FCI Danbury in particular, Mot. for

Recons. at 7–9.

## III.    LEGAL STANDARD

No express authority permits the defendant or the government in a criminal case to seek

reconsideration of a previously disposed of motion. Nevertheless, courts permit motions for

reconsideration in criminal cases, analyzing them under the same standard that applies in civil

cases. See, e.g., United States v. Natal, No. 12-CR-164, 2014 WL 5361469, at *3 (D. Conn. Oct.

21, 2014); United States v. Almonte, No. 14-CR-86, 2014 WL 3702598, at *1 (S.D.N.Y. July 24,

2014); United States v. Moreno, 12 F. Supp. 3d 313, 315 n.2 (N.D.N.Y. 2014).

 "The major grounds justifying reconsideration are an intervening change of controlling

law, the availability of new evidence, or the need to correct a clear error or prevent manifest

injustice." Virgin Atlantic Airways, Ltd. v. Nat'l Mediation Bd., 956 F.2d 1245, 1255 (2d Cir.

1992) (internal citation and quotation marks omitted). "Reconsideration of a court's previous

order is an 'extraordinary remedy to be employed sparingly in the interests of finality and

conservation of scarce judicial resources.'" Parrish v. Sollecito, 253 F. Supp. 2d 713, 715

(S.D.N.Y. 2003) (quoting In re Health Mgmt. Sys., Sec. Litig., 113 F. Supp. 2d 613, 614

(S.D.N.Y. 2000)).

Such motions "will generally be denied unless the moving party can point to controlling

decisions or data that the court overlooked—matters, in other words, that might reasonably be

expected to alter the conclusion reached by the court." Shrader v. CSX Transp., Inc., 70 F.3d

255, 257 (2d Cir. 1995). "[A] motion to reconsider should not be granted where the moving party

seeks solely to re[-]litigate an issue already decided." Id. at 257. "[A] motion for reconsideration

is neither an occasion for repeating old arguments previously rejected nor an opportunity for

making new arguments that could have been previously advanced." Associated Press v. U.S.

Dep't of Def., 395 F. Supp. 2d 17, 19 (S.D.N.Y. 2005). "[T]he movant must present evidence

that is 'truly newly discovered or . . . could not have been found by due diligence.'" Ins. Co. of

N. Am. v. Public Serv. Mut. Ins. Co., 609 F.3d 122, 131 (2d. Cir. 2010) (citing United States v.

Potamkin Cadillac Corp., 697 F.2d 491, 493 (2d Cir. 1983).

IV.   **DISCUSSION**

   **A.  New evidence**

For the reasons that follow, the Court will consider the following evidence that the

Government offers in connection with its Motion for Reconsideration: (1) statements in the

Bardes Declaration indicating that available scientific knowledge undercuts the Court's factual

claim that hypertension is a risk factor, Bardes. Decl. ¶¶8–9; (2) a May 1 study in the New

England Journal of Medicine addressing the relationship between ACE inhibitors and the likelihood of SARS-CoV-2 infection; (3) statements in the Bardes Declaration regarding the relationship between ACE inhibitors and the likelihood of SARS-CoV-2 infection, see Bardes. Decl. ¶¶ 7(c)–(d), 8(c); and (4) evidence regarding BOP's mitigative measures taken in response to the pandemic, see Mot. for Recons. at 7–9, insofar as this evidence sheds light on conditions at FCI Danbury around the time of Salvagno's release.

As a general matter, there is undoubtedly newly available scientific information relevant to Salvagno's claim for compassionate release, as the science surrounding COVID-19 risk factors has constantly and rapidly evolved over the past two months, including the science surrounding the relationship between hypertension and COVID-19. For instance, one of the ACE inhibitor studies the Government offers, which tends to undermine the scientific proposition embraced by the Court in its April 23 Memorandum-Decision and Order that ACE inhibitors increase the likelihood of infection from SARS-CoV-2, is clearly new evidence, as it was published after the April 23 Order. See Reynolds, et al., *Renin–Angiotensin–Aldosterone System Inhibitors and Risk of Covid-19*, NEW ENGLAND JOURNAL OF MEDICINE, May 1, 2020.[2] As discussed below, there are several other new studies addressing this same question regarding ACE inhibitors. The availability of new scientific evidence undermining the link between ACE inhibitors and increased likelihood of infection bears on a factual proposition on which the court partly relied in ordering Salvagno's release and is thus a proper basis for reconsideration.[3]

---

[2]  https://www.nejm.org/doi/full/10.1056/NEJMoa2008975?query=featured_coronavirus.

[3]  The other ACE inhibitor study the Government cites is new for the same reason but not a proper basis for reconsideration, as the study casts doubt on a proposition not relied upon in the April 23 Order—that ACE inhibitors increase the risk of severe illness and death from COVID-

But beyond these specific studies, there is a wealth of new scientific information bearing

on the relationship between hypertension and COVID-19. Thus, while the Court notes below that

some of the Government's specific factual assertions and arguments bearing on the status of

hypertension as a risk factor are not proper bases for consideration, the Government's broader

factual claim that available scientific knowledge shows that hypertension is not a risk factor, is a

proper basis for reconsideration, insofar as fully addressing this factual question requires the

Court to consider scientific information that has emerged since its April 23 opinion. Below, the

Court addresses at length the relationship between hypertension and COVID-19, discussing both

scientific information available before April 23 and scientific information not available until after

April 23.

The Government asserts in its Motion for Reconsideration that "hypertension" does not

increase the risk of severe illness from COVID-19. Mot. for Recons. at 5–6.[4] This assertion is

---

19, as opposed to the risk of infection. See Li, et al., *Association of Renin-Angiotensin System Inhibitors With Severity or Risk of Death in Patients With Hypertension Hospitalized for Coronavirus Disease 2019 (COVID-19) Infection in Wuhan, China*, JAMA CARDIOLOGY, April 23, 2020, https://jamanetwork.com/journals/jamacardiology/fullarticle/2765049?widget=personalizedcontent&previousarticle=2763844. Evidence that is "irrelevant to the ultimate outcome" is not a proper basis for reconsideration. See Latimore v. NBC Universal, Inc., 489 F. App'x 521, 521 (2d Cir. 2013).

[4] Salvagno has "essential (primary) hypertension," Medical Records at 64, 79, which Dr. Bardes refers to as "systemic hypertension," Bardes Decl. ¶8(a). "Hypertension" is synonymous with "high blood pressure." *High Blood Pressure (Hypertension)*, Mayo Clinic, https://www.mayoclinic.org/diseases-conditions/high-blood-pressure/symptoms-causes/syc-20373410 (last visited Jun. 19, 2020). Essential (primary) hypertension, the most common type of high blood pressure, is high blood pressure "with no identifiable cause." Id. Pulmonary hypertension is a distinct condition. "Pulmonary hypertension is a type of high blood pressure that affects the arteries in your lungs and the right side of your heart." *Pulmonary Hypertension*, Mayo Clinic, https://www.mayoclinic.org/diseases-conditions/pulmonary-hypertension/symptoms-causes/syc-2

based in part on a page of the Centers for Disease Control ("CDC") website that includes the following item in a bulleted list of risk factors: "Serious heart conditions, including heart failure, coronary artery disease, congenital heart disease, cardiomyopathies, and *pulmonary hypertension*, may put people at higher risk for severe illness from COVID-19." *Groups at Higher Risk for Severe Illness*, CDC[5] (emphasis added). The Government argues that because this specific list on this particular web page only includes "pulmonary hypertension," and not "hypertension," hypertension is not a risk factor. Mot. for Recons. at 5–6. But Salvagno clearly represented in his April 6 Motion for Compassionate Release that he had hypertension, and not "pulmonary hypertension," see Mot. for Recons. at 4 ("I have been diagnosed with and take daily medications for chronic hypertension"), and represented the same in his April 10 reply, see Dkt. No. 1164-1 at 4 (stating that "two years ago the staff here diagnosed me with hypertension, and I have been placed on a daily regimen of Lisinopril since that time" and that Lisinopril is prescribed as a treatment for "high blood pressure"). Moreover, the mentioned CDC guidance was available well before April 23. Thus, the Government could have cited this web page in response to Salvagno's Motion for Compassionate Release as a basis for its present factual

---

0350697 (last visited Jun. 19, 2020). "Pulmonary blood pressure is normally a lot lower than systemic blood pressure." *Pulmonary Hypertension - High Blood Pressure in the Heart-to-Lung System*, American Heart Association, https://www.heart.org/en/health-topics/high-blood-pressure/the-facts-about-high-blood-pressure/pulmonary-hypertension-high-blood-pressure-in-the-heart-to-lung-system (last visited Jun. 19, 2020). Throughout this opinion, the Court uses the term "hypertension" to refer to Salvagno's condition, also known as "high blood pressure," and not to "pulmonary hypertension" or to a broader concept that encompasses "pulmonary hypertension" as well as other forms of hypertension.

[5] https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/groups-at-higher-risk.html (last visited Jun. 19, 2020).

assertion that hypertension is not a risk factor. Consequently, the existence of this CDC guidance is not a proper basis for reconsideration. See Pettiford v. Devito, 2020 U.S. Dist. LEXIS 73989, at *6 (S.D.N.Y. Apr. 27, 2020) ("Newly discovered evidence must not have been available prior to entry of the judgment leading to reconsideration."); See also Lima LS PLC v. Nassau Reinsurance Grp. Holdings, L.P., 160 F. Supp. 3d 574, 578 (S.D.N.Y. 2015) (denying motion for reconsideration based on evidence "in response to the court's rulings" when such evidence was available "prior to the Court's Order"). Nevertheless, the Court considers the Government's broader scientific claim that hypertension is not a risk factor, as this factual claim appears to be based on the totality of existing scientific knowledge on this question, including research published since April 23. See Bardes Decl. ¶¶8–9.

The Government relatedly seeks to correct clear errors of fact in this Court's purported findings that Salvagno had asserted that he had pulmonary hypertension, and that the CDC's reference to "pulmonary hypertension" encompassed Salvagno's condition. These are not proper bases for reconsideration, as the Court did not make either finding, rendering any evidence tending to undermine either proposition "irrelevant to the ultimate outcome" of the Court's April 23 opinion. See Latimore, 489 F. App'x at 521. Rather, the Court found that Salvagno's *hypertension* increased his risk of severe illness and death from COVID-19. See Apr. 23 Mem.-Decision and Order at 10 (noting that "one court within the Southern District of New York has recognized that current conditions at FCI Danbury, when combined with the risk of serious infection presented by hypertension, justify waiving § 3582(c)(1)(A)'s exhaustion requirement," and citing a compassionate release case involving an inmate with hypertension); 11 ("Defendant faces a heightened risk of developing severe symptoms once infected, due to his

10

hypertension[.]"). As discussed below, these findings were supported by CDC guidance and other information available on April 23; and the development of scientific knowledge since April 23 has provided even greater support for the proposition that hypertension is a risk factor.

The Government presents medical records dating back several years, see Medical Records, while the court relied simply on a current diagnosis of hypertension in its April 23 Order, see Dkt. No. 1160-2. These new Medical Records largely confirm what the Court already knew based on BOP records and stated in its April 23 Memorandum-Decision and Order, which is that Salvagno has hypertension. More specifically, the supplemental Medical Records submitted by the Government indicate that, at various times between 2018 and 2020, Salvagno had blood pressure readings in both the stage 1 and stage 2 hypertension ranges,[6] that he was consistently diagnosed throughout this period as having "essential (primary) hypertension," and that he took Lisinopril throughout the same period.[7] Specific blood pressure readings constitute new and potentially relevant evidence, insofar as the severity of Salvagno's hypertension bears on the extent to which his hypertension increased his risk of severe illness or death from COVID-19. By extension, Dr. Bardes' professional opinion on this point based on these blood pressure

---

[6] *Blood Pressure Chart: What Your Reading Means*, MAYO CLINC, https://www.mayoclinic.org/diseases-conditions/high-blood-pressure/in-depth/blood-pressure/art-20050982 (last visited Jun. 19, 2020) (indicating that a top number (systolic) between 130 and 139 or a bottom number (diastolic) between 80 and 89 indicates stage 1 hypertension, while a systolic reading of at least 140 or a diastolic reading of at least 90 indicates stage 2 hypertension).

[7] See Medical Records at 59 (October, 31, 2018: 141/88; October 31, 2018: 144/96; 2018; December 6, 2018: 133/84; December 21, 2018: 133/79), 80 (October 17, 2019: 138/88), 64 (noting 10/31/2018 diagnosis for "essential ('primary') hypertension"), 79 (12/04/2019 record noting "essential ('primary') hypertension"), 98 (noting that Salvagno began taking Lisinopril in November 2018).

readings, see Bardes Decl. ¶8(d), is also new evidence.

The Government could have accessed these supplemental BOP medical records and presented them before the Court issues the April 23 Memorandum-Decision and Order. See Westerly Electronics Corp. v. Walter Kidde & Co., 367 F.2d 269, 270 (2d Cir. 1966) (denying reconsideration when the Plaintiff had not shown that evidence newly presented was "truly newly discovered or that it could not have been found by due diligence"). The Government had over two weeks to do so after Salvagno asserted on April 6 that he had hypertension, Mot. for Recons. at 4, an assertion that he clarified on April 10 was documented by BOP records, Dkt. No. 1164-1 at 4. The Government also could have arranged to have Dr. Bardes review those medical records before the April 23 Memorandum-Decision and Order. Nevertheless, the convoluted procedural history behind Salvagno's compassionate release motion might have created confusion about the proper time to submit medical evidence. Salvagno styled his COVID-19 compassionate release motion as a supplemental brief in the context of a pending motion for reconsideration of a pre-pandemic compassionate release motion that requested relief on an unrelated basis. Dkt. No. 1162-1 at 2. The Government could have reasonably anticipated the opportunity to submit additional briefing regarding Salvagno's Medical Records after receiving clarification from the Court regarding the unusual procedural posture of the case. Thus, the Court finds that the availability of Salvagno's specific blood pressure readings is a proper basis for reconsideration.

The Government also submits information about the recent effectiveness BOP's response to the pandemic. Mot. for Recons. at 7–9. The Court considers this evidence insofar as it sheds light on BOP's capacity to protect prisoners at FCI Danbury around the time that Salvagno was incarcerated.

### B.  Hypertension as a Risk Factor

The Court begins with the factual question of whether hypertension is a risk factor for serious illness, poor outcomes, and death from COVID-19, as this central factual issue is relevant both to the question of whether the Court properly waived exhaustion in this case and to the "extraordinary and compelling reason" inquiry under 18 U.S.C. § 3582(c)(1)(A)(i). "Courts faced with disputed factual issues relevant to a sentencing proceeding have broad discretion in determining how to resolve such issues." United States v. Gilleo, No. 15-CR-346 , 2016 WL 1090614, at *4 (S.D.N.Y. Mar. 18, 2016), aff'd, 683 F. App'x 85 (2d Cir. 2017) (citing United States v. Bahel, 662 F.3d 610, 646 (2d Cir. 2011)). "Because such factual disputes are in connection with a sentencing proceeding, the Federal Rules of Evidence do not apply." United States v. Ahders, 622 F.3d 115, 119 (2d Cir. 2010); see also Fed. R. Evid. 1101(d) ("Exceptions. These rules—except for those on privilege—do not apply to the following: . . . (3) . . . sentencing"). The Court may consider "any relevant evidence having sufficient indicia of reliability." United States v. Brown, 52 F.3d 415, 425 (2d Cir. 1995).

Knowledge about COVID-19 is currently limited, and the scientific community does not know with certainty what underlying health conditions *cause*, as opposed to *correlate* with, severe manifestations of COVID-19. As the CDC acknowledges, COVID-19 "is a new disease and there is limited information regarding risk factors for severe disease." *Groups at Higher Risk for Severe Illness*, CDC. The relationship between hypertension and severe illness from COVID-19 is one battleground in this unsettled and rapidly evolving area of scientific research. See United States v. Catanzarite, No. 18-CR-362, 2020 WL 2786927, at *4 (D.N.J. May 29, 2020) ("The competing arguments and sources presented by the parties demonstrate that the

13

relationship between hypertension, obesity, and elevated risk from COVID-19 is not fully understood. A review of applicable COVID-19 case law similarly reveals varying information about defendants who suffer from hypertension and/or obesity."); United States v. Bray-D9, No. 19-CV-20216, 2020 U.S. Dist. LEXIS 85975, at *9 (E.D. Mich. May 14, 2020) (noting that "new information about potential co-morbidities is rapidly changing").

What the scientific community knows with relative certainty is that hypertension is one of the most common "comorbidities" in people who experience severe cases of COVID-19, a fact that has been apparent since the early days of the pandemic; indeed, much research identifies hypertension as the *most* common comorbidity. See, e.g., *Hospitalization Rates and Characteristics of Patients Hospitalized with Laboratory-Confirmed Coronavirus Disease 2019*, CDC[8] (finding that hypertension is the most common morbidity among hospitalized COVID-19 patients in the United States, with roughly 50% of all adults hospitalized in the United States suffering from hypertension); *Interim Clinical Guidance for Management of Patients with Confirmed Coronavirus Disease*, CDC[9] ("Patients in China with no reported underlying medical conditions had an overall case fatality of 0.9%, but case fatality was higher for patients with comorbidities: 10.5% for those with cardiovascular disease, 7.3% for diabetes, and approximately 6% each for chronic respiratory disease, hypertension, and cancer. Heart disease, hypertension, prior stroke, diabetes, chronic lung disease, and chronic kidney disease have all been associated with increased illness severity and adverse outcomes."); *Report of the*

---

[8]  https://www.cdc.gov/mmwr/volumes/69/wr/mm6915e3.htm (last visited Jun. 19, 2020).

[9]  https://www.cdc.gov/coronavirus/2019-ncov/hcp/clinical-guidance-management-patients.html (last visited Jun. 19, 2020).

*WHO-China Joint Mission on Coronavirus Disease 2019 (COVID-19)*, WORLD HEALTH

ORGANIZATION ("WHO"), Feb. 24, 2020, at 12[10] ("While patients who reported no comorbid

conditions had a CFR ['crude fatality ratio'] of 1.4%, patients with comorbid conditions had

much higher rates: 13.2% for those with cardiovascular disease, 9.2% for diabetes, 8.4% for

hypertension, 8.0% for chronic respiratory disease, and 7.6% for cancer."); Wei-jie Guan, et al.,

*Comorbidity and its impact on 1590 patients with Covid-19 in China: A Nationwide Analysis,*

EUROPEAN RESPIRATORY JOURNAL, May 14, 2020[11] (finding that "[a]mong laboratory confirmed

cases of COVID-19, patients with any comorbidity yielded poorer clinical outcomes than those

without" and finding that the most common comorbidities were diabetes, hypertension and "other

cardiovascular and cerebrovascular diseases"); Safiya Richardson, et al., *Presenting*

*Characteristics, Comorbidities, and Outcomes Among 5700 Patients Hospitalized with*

*COVID-19 in the New York City Area*, THE JOURNAL OF THE AMERICAN MEDICAL ASSOCIATION,

April 22, 2020[12] (finding that among patients hospitalized in New York City, "[t]he most

common comorbidities were hypertension (3026; 56.6%), obesity (1737; 41.7%), and diabetes

(1808; 33.8%)"); *Covid-19 Tracker, Fatalities*, NEW YORK DEPARTMENT OF HEALTH[13] (data

from the New York State government indicating that hypertension is the most common

---

[10]

https://www.who.int/docs/default-source/coronaviruse/who-china-joint-mission-on-covid-19-final-report.pdf.

[11]  https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7098485/.

[12]  https://jamanetwork.com/journals/jama/fullarticle/2765184.

[13]

https://covid19tracker.health.ny.gov/views/NYS-COVID19-Tracker/NYSDOHCOVID-19Tracker-Fatalities?%3Aembed=yes&%3Atoolbar=no&%3Atabs=n (last visited Jun. 19, 2020).

comorbidity overall among people who have died from COVID-19, and the most common

specifically among people over 40 who have died from COVID-19); *COVID-19*, LOUISIANA

DEPARTMENT OF HEALTH[14] (data from the Louisiana government indicating that hypertension is

the most common comorbidity among people who have died from COVID-19); Kulkarni, et al.,

*COVID-19 and Hypertension*, JOURNAL OF THE RENIN-ANGIOTENSIN-ALDOSTERONE SYSTEM,

May 20, 2020[15] (collecting and summarizing studies of COVID-19 in China and Italy showing a

prominent correlation between hypertension and severe COVID-19 outcomes); Nadar, et al.,

*Managing Hypertension During the COVID-19 Pandemic,* JOURNAL OF HUMAN HYPERTENSION,

May 14, 2020 (noting that data from China and the United States indicates that hypertension is

"the most prevalent comorbidity among patients admitted with COVID-19 being present in at

least 30–49% of them," that "[h]ypertensive patients who develop COVID-19 are more likely to

be admitted to hospital than normotensive individuals," and that "[t]he presence of hypertension

also seems to be associated with poorer outcomes from COVID-19," and citing sources).[16]

For many courts, this strong correlation has been sufficient to find that COVID-19 poses

a heightened risk to hypertensive inmates, for purposes of compassionate release. See, e.g.,

United States v. Lavy, 17-CR-20033, 2020 WL 3218110, at *4 (D. Kan. June 15, 2020) (citing

scientific studies); United States v. Burke, No. 17-CR-3089, 2020 WL 3000330, at *2 (D. Neb.

June 4, 2020) (citing scientific studies); United States v. Foreman, No. 19-CR-62, 2020 WL

2315908 at *3–4 (D. Conn. May 11, 2020) (citing New York city and state data); United States v.

---

[14]   http://ldh.la.gov/coronavirus/ (last visited Jun. 19, 2020).

[15]   https://journals.sagepub.com/doi/full/10.1177/1470320320927851.

[16]   https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7224587/.

Pena, No. 15-CR-551, 2020 WL 2301199, at *4 (S.D.N.Y. May 8, 2020) (citing CDC data).

United States v. Pabon, No. 17-CR-165, 2020 WL 2112265, at *1 (E.D. Pa. May 4, 2020) (citing

scientific articles and data from China,  New York City, and New York State); United States v.

Soto, No. 18-CR-10086, 2020 WL 2104787, at *2 (D. Mass. May 1, 2020) (citing WHO data);

United States v. Scparta, No. 18-CR-578, 2020 WL 1910481, at *9 (S.D.N.Y. Apr. 20, 2020)

(citing CDC data). Given limited information about risk factors, this approach has some

justification: if scientific certainty is elusive, courts adjudicating compassionate release

applications must consider legitimate possibilities, supported by reliable evidence, that inmates

face particularized health risks.

        But as the Government correctly states in its Reply, correlation (i.e., the prevalence of

hypertension as a comorbidity) does not logically entail causation (i.e., that hypertension is a

"risk factor"). Reply at 5. Indeed, from a scientist's perspective, it is somewhat unclear what

explains this strong correlation, and not all plausible explanations in the scientific literature point

to hypertension as a *cause* of severe illness from COVID-19. But, given the unsettled nature of

the science surrounding risk factors, to say, as the Government appears to suggest in its Reply,

that the Court must find that there is a *well-established* causal link between hypertension and

severe manifestations of COVID-19, supported by scientific consensus, or else reject Salvagno's

factual assertion that he is at heightened risk, sets an unrealistically high bar. As discussed below,

there is a significant quantity of reliable evidence that hypertension is a risk factor for severe

illness, poor outcomes, and death from COVID-19, and not just a prevalent comorbidity; and this

is sufficient to support such a factual finding.

As one researcher has recounted, over the course of the pandemic, at least three

hypotheses have been offered to explain the strong correlation between hypertension and severe

manifestations of COVID-19. See Nadar, et al., *Managing Hypertension During the COVID-19

Pandemic*, JOURNAL OF HUMAN HYPERTENSION, May 14, 2020. One theory is that people with

hypertension often are older or have other medical conditions, and that advanced age or those

other medical conditions are what actually causes the poor outcomes associated with

hypertension in COVID-19 infection. Id. ("It not clear whether it is hypertension per se that

contributes to the increased morbidity, or whether patients with hypertension have more

underlying health problems, as data have confirmed that patients with multiple comorbidities are

likely to fare worse."). Another theory, which, while not rejected by consensus seems to have

been substantially undermined since the April 23 Memorandum-Decision and Order, is that the

medication many people take to treat hypertension, ACE inhibitors, increases susceptibility to

infection or the likelihood of severe illness. Id. ("Concern was . . . raised at the start of the

pandemic that ACE inhibitors and angiotensin receptor blockers (ARBs), medications that are

commonly used for hypertension and heart failure, could have a potential deleterious effect."). A

third theory, one that has been the subject of an emerging consensus since the Court issued its

April 23 opinion, is that hypertension and COVID-19 both affect the endothelial system, which

regulates blood clotting, and that severe illness from COVID-19 results from excessive clotting.

Id. ("[T]he interaction of SARS-CoV-2 virus with ACE2 in the endothelial cell does raise the

possibility that endothelial dysfunction, which commonly occurs in hypertension, may exacerbate

the effect of the virus . . . There is[] mounting concern about possible thromboembolic

complications of the virus and a possible procoagulable state . . . hypertension [is] known to be

associated with a hypercoagulable state and it is possible that an interaction between these two
conditions might lead to a worsening thrombotic milieu.").[17]

In online guidance published on May 12, the CDC embraced the first of these theories,
stating that "high blood pressure" is not independently associated with severe manifestations of

---

[17] The theory that severe illness from COVID-19 has a substantial vascular component
appears to be gaining traction. See Diana Kwon, *From Headaches to 'COVID Toes,'
Coronavirus Symptoms Are a Bizarre Mix*, Scientific American, May 18, 2020,
https://www.scientificamerican.com/article/from-headaches-to-covid-toes-coronavirus-
symptoms-are-a-bizarre-mix1/ ("COVID-19 'is a vascular problem' says Frank Ruschitzka, a
cardiologist at University Hospital Zurich. 'The lung is the main battlefield, but it's a disease of
the blood vessels.'"). Specifically, many scientists now believe that hypercoagulability (excessive
blood-clotting) is the mechanism by which the virus causes severe illness. Id.; see also Cassandra
Willyard, *Coronavirus blood-clot mystery intensifies*, Nature, May 8, 2020,
https://www.nature.com/articles/d41586-020-01403-8 ("Studies from the Netherlands and France
suggest that clots arise in 20–30% of critically ill COVID-19 patients"). As the author of this
Nature article explains, hypertension is a risk factor for hypercoagulability, which could lead to a
dangerous interaction COVID-19. See id. ("People with the disease who become hospitalized
typically have a number of risk factors for clotting. They might be elderly or overweight, and
could have high blood pressure or diabetes."); see also Sardu, et al., *Hypertension, Thrombosis,
Kidney Failure, and Diabetes: Is COVID-19 an Endothelial Disease: A Comprehensive
Evaluation of Clinical and Basic Evidence*, Journal of Clinical Medicine, May 11, 2020,
https://www.mdpi.com/2077-0383/9/5/1417 (finding that the prevalence of hypertension as a
comorbidity is explained by dysfunction of the endothelium, which is involved in the regulation
of blood clotting). Indeed, the low incidence of severe illness from COVID-19 among infected
young people might be explicable by reference to the relative health of the endothelium in
children. See David Cyranoski, *Why children avoid the worst coronavirus complications might
lie in their arteries*, Nature, June 11, 2020,
https://www.nature.com/articles/d41586-020-01692-z. The CDC has acknowledged evidence
that excess blood clotting might be the mechanism behind severe illness from COVID-19, but
without detailing how this relates to any suspected risk factors. See *Interim Clinical Guidance
for Management of Patients with Confirmed Coronavirus Disease*, CDC. The NIH has also noted
a growing body of research supporting this understanding of COVID-19, while noting the need
for further research. See National Institutes of Health ("NIH"), *Antithrombotic Therapy in
Patients with COVID-19*, https://www.covid19treatmentguidelines.nih.gov/antithrombotic-
therapy/ (last visited Jun. 19, 2020).

COVID-19.[18] But the CDC has since retracted this guidance,[19] which suggests that the CDC has

rejected this view. The Government filed its Motion for Reconsideration a few days before the

CDC initially published this now-retracted guidance.

In its motion, the Government instead relied on the following page on the CDC's website,

cited above: *Groups at Higher Risk for Severe Illness*, CDC. See Mot. for Recons. at 6. On this

page, the CDC states: "Serious heart conditions, including heart failure, coronary artery disease,

congenital heart disease, cardiomyopathies, and pulmonary hypertension, may put people at

higher risk for severe illness from COVID-19." This list does not include hypertension as the

Court has defined the term. But this list is evidently a non-exclusive list of heart conditions; and

hypertension is a condition known to strain the heart and to cause heart failure, heart attacks, and

coronary artery disease, among other serious heart ailments. See *High blood pressure dangers:*

*Hypertension's effects on your body*, MAYO CLINIC[20]; *High Blood Pressure Symptoms and*

*Causes*, CDC[21]; see also Segars v. United States, No. 16-CR-20222, 2020 WL 3172734, at *3

---

[18]   See United States v. Aikens, No. 19-CR-67, 2020 WL 2744192, at *4 (W.D.N.Y. May 26, 2020) (quoting *Coronavirus Disease 2019 (COVID-19)-Frequently Asked Questions*, CDC, https://www.cdc.gov/coronavirus/2019-ncov/faq.html) ("At this time, we do not think that people with high blood pressure and no other underlying health conditions are more likely than others to get severely ill from COVID-19. Although many people who have gotten severely ill from COVID-19 have high blood pressure, they are often older or have other medical conditions like obesity, diabetes, and serious heart conditions that place them at higher risk of severe illness from COVID-19.").

[19]   https://www.cdc.gov/coronavirus/2019-ncov/faq.html (last visited Jun. 19, 2020).

[20] https://www.mayoclinic.org/diseases-conditions/high-blood-pressure/in-depth/high-blood-pressure/art-20045868 (last visited Jun. 19, 2020).

[21]   https://www.cdc.gov/bloodpressure/about.htm (last visited Jun. 19, 2020).

(E.D. Mich. June 15, 2020) ("Although the CDC only lists pulmonary hypertension on its list of risk factors, the Court reads the CDC's list to be merely inclusive rather than exclusive and exhaustive."). Moreover, on April 23 (as now), the CDC in another part of its online guidance identified hypertension as a common comorbidity in people who experienced severe illness from COVID-19. See *Interim Clinical Guidance for Management of Patients with Confirmed Coronavirus Disease*, CDC. But most importantly, however interpreted, the absence of hypertension from the CDC's list of "serious heart conditions" is not determinative of the issue of whether hypertension places an inmate at higher risk of severe illness or death. As discussed throughout this order, courts have found that hypertensive inmates are at risk based on a variety of sources, including several different pages of the CDC website, as well as data from the WHO, data from various government websites, and scientific studies. More generally, Courts do not regard the CDC website as the only appropriate source of scientific information bearing on the identification of risk factors. See, e.g., Segars, 2020 WL 3172734, at *3 (noting that "[t]he rapidly changing nature of science surrounding this novel virus displaces the CDC as the sole medical authority on COVID-19 risk factors."); Lavy, 2020 WL 3218110, at *5 (finding based on scientific studies that bipolar disorder and major depressive disorder are associated with immune system dysfunction, even though such conditions are not listed on the CDC's non-exclusive list of contributors to immunocompromization); United States v. Jenkins, No. 99-CR-439, 2020 WL 2466911, at *6 (D. Colo. May 8, 2020) (finding based on a scientific study that a history of strokes is a risk factor, even though the CDC does not identify this as a risk factor); United States v. El-Hanafi, No. 10-CR-162, 2020 WL 2538384, at *4 (S.D.N.Y. May 19, 2020) (citing defendant's expert report providing that anti-phospholipid syndrome "shares with other

recognized risk factors for severe COVID-19 disease the fact that it is a chronic inflammatory condition"). Neither does the CDC itself. See *Coronavirus Disease 2019 (COVID-19) - Frequently Asked Questions* CDC ("People with underlying medical conditions not on the list might also be at higher risk and should consult with their healthcare provider if they are concerned."). The Court does not confine itself to the CDC website, because the CDC is not the only reliable source of information about COVID-19, there is a lack of consensus regarding COVID-19 risk factors, the CDC itself does not purport to represent consensus views of the science surrounding COVID-19, and, as the retraction of the "high blood pressure" guidance illustrates, the CDC frequently alters its online guidance in significant ways.

Both the NIH and the WHO appear to identify hypertension as a risk factor. See *Overview and Spectrum of COVID-19*, NIH[22] (noting that, in addition to people age 65 or older, "[o]thers at highest risk for COVID-19 are people of any age with certain underlying conditions, especially when not well-controlled, including . . . Hypertension"); *Q&A: Older People and COVID-19*, WHO[23] ("Older people, and people of all ages with pre-existing medical conditions (such as . . . high blood pressure . . .) appear to develop serious illness more often than others.").

Additionally, several peer-reviewed scientific studies and research commentaries in reputable scientific journals conclude that hypertension is independently associated with severe manifestations of COVID-19, controlling for the confounding variables of age and other health conditions. Gao, et al., *Association of hypertension and antihypertensive treatment with COVID-*

---

[22]  https://covid19treatmentguidelines.nih.gov/overview/ (last visited Jun. 19, 2020).

[23]
https://www.who.int/emergencies/diseases/novel-coronavirus-2019/question-and-answers-hub/q-a-detail/q-a-on-on-covid-19-for-older-people (last visited Jun. 19, 2020).

*19 mortality: a retrospective observational study*, EUROPEAN HEART JOURNAL, June 5, 2020[24]
(concluding that "after adjustment for confounders [including age and other health conditions]
and compared with the non-hypertensive patients, the hypertensive patients continued to
demonstrate a two-fold relative increase in the risk of COVID-19 mortality")[25]; Zhang, et al.,
*Associations of hypertension with the severity and fatality of SARS-CoV-2 infection: A meta-
analysis*, EPIDEMIOLOGY AND INFECTION, May 28, 2020[26] (concluding that hospital patients with
hypertension have a 2.27-fold higher risk of severe illness and a 3.48-fold higher risk of death
compared with COVID-19 patients without hypertension, and that an association with severe
illness and death holds true for hypertensive patients both younger and older than age 50); Li, et
al., *Risk factors for severity and mortality in adult COVID-19 inpatients in Wuhan*, JOURNAL OF
ALLERGY AND CLINICAL IMMUNOLOGY, April 12, 2020[27] (finding that among patients with
COVID-19 admitted to Tongji Hospital from January 26, 2020 to February 5, 2020,
"hypertension was the only comorbidity associated with the severity of COVID-19 after
adjustment for age, sex, and smoking status"); Kulkarni, et al., *COVID-19 and Hypertension*,

---

[24]  https://academic.oup.com/eurheartj/article/41/22/2058/5851436.

[25]  See also United States v. DeBartolo, No. 14-CR-16, 2020 WL 3105032, at *2 (D.R.I.
June 11, 2020) (citing this study and noting that "[t]he CDC does not yet list hypertension as an
increased risk factor for severe COVID-19 on its website. However, research regarding this risk
factor is also emerging and while the picture with respect to hypertension is not yet clear, at least
one recent study suggests hypertension increases the relative risk of mortality two-fold for a
patient hospitalized with COVID-19, as compared with those without hypertension.").

[26]  https://www.cambridge.org/core/journals/epidemiology-and-
infection/article/associations-of-hypertension-with-the-severity-and-fatality-of-sarscov2-
infection-a-metaanalysis/4116FAD7D866737099F976E7E7FAEB15

[27]  https://www.sciencedirect.com/science/article/pii/S0091674920304954

JOURNAL OF THE RENIN-ANGIOTENSIN-ALDOSTERONE SYSTEM, May 20, 2020 (research commentary stating that existing research suggests a "causal link" between hypertension and poor COVID-19 outcomes); T.M. Cook, *The importance of hypertension as a risk factor for severe illness and mortality in COVID-19*, ANAESTHESIA, April 27, 2020[28] (research commentary concluding that "[b]ased on the current evidence, hypertension should be considered as a significant risk factor for poor outcomes amongst those presenting to hospital with COVID 19"); see also United States v. White, No. 13-CR-20653, Dkt. No. 51-1 (E.D. Mich. May 11, 2020) (Aff. of Epidemiologist Katie Lin Brasher-Beaudry), at 8 ("[T]he majority of credible data and research related to the relationship between hypertension and COVID-19 suggests that hypertension puts patients at a higher risk of becoming ill with COVID-19, experiencing severe symptoms, being hospitalized and/or dying.").

Existing data suggests that Salvagno's age of 53 adds to his risk. The CDC identifies an age of 65 or older as a standalone risk factor. See *Groups at Higher Risk for Severe Illness*, CDC. But data from New York identifies hypertension as the most common comorbidity among people who died from COVID-19 in New York state, and indicates that this correlation holds true specifically for people in their fifties. See *Covid-19 Tracker, Fatalities*, NEW YORK DEPARTMENT OF HEALTH, (Apr. 17, 2020); see also *COVIDView*, CDC[29] (finding the cumulative hospitalization rate since March 1 for adults aged 50 to 64 years to be 136.1 per 100,000 while the overall cumulative rate is 89.3 per 100,000); Robert Verity et al., *Estimates of the severity of*

---

[28] https://onlinelibrary.wiley.com/doi/full/10.1111/anae.15103

[29]  https://www.cdc.gov/coronavirus/2019-ncov/covid-data/covidview/index.html (last visited Jun. 19, 2020).

*coronavirus disease 2019: a model-based analysis*, LANCET INFECTIOUS DISEASES, Mar. 30, 2020[30] (finding that the risk of death from COVID-19 rises with each decade of age).[31]

The Government does not dispute that Salvagno has hypertension (an assertion supported by BOP records) but suggests via Dr. Bardes that Salvagno's hypertension is too "mild" and "controlled" with medication to be considered a risk factor. See Bardes Decl. ¶8(d). Even if the Court were to find that Dr. Bardes's characterizations of Salvagno's blood pressure readings as "mild" or "controlled" were accurate in a broad sense,[32] the fact would remain that Dr. Bardes's consequent inference about Salvagno's risk of severe illness and death from COVID-19 is not supported by existing research. The NIH advises in a general manner, in agreement with Dr.

---

[30]  https://doi.org/10.1016/S1473-3099(20)30243-7.

[31]  Other courts have made similar findings. See, e.g., Pabon, 2020 WL 2112265, at *4 (finding an inmate's age of 54 to be a "contributing factor to the increased risk he faces from COVID-19," on top of his hypertension and diabetes, based on the first and third sources cited above); Foreman, 2020 WL 2315908, at *3–4 (finding that an inmate's age of 58, in combination with her hypertension, increases her risk of severe illness from COVID-19, based on the first source cited above); Jenkins, 2020 WL 2466911, at *6 (finding that "[a]lthough the CDC only classifies individuals over the age of 65 as 'older adults' at higher risk for severe illness, Mr. Jenkins' age of 60 still increases his risk significantly," based on the second source cited above); Lavy, 2020 WL 3218110, at *4–5 (finding based on the second source cited above that an inmate's age of 58 increased his risk of severe illness and death from COVID-19, when considered in combination with his hypertension and immunocompromization).

[32]  This is a disputable assertion. Salvagno has a recent history of both stage 1 and stage 2 blood pressure readings. See Medical Records at 59, 80; supra notes 6, 7. His blood pressure is, thus, to say the least, not so controlled by medication that his blood pressure readings no longer constitute "high blood pressure." Moreover, BOP medical professionals who have directly examined Salvagno have not indicated that his blood pressure is "controlled," that he at any point no longer needed medication, or any similar annotation. Cf. United States v. Leonard, No. 16-CR-75, 2020 WL 3207085, at *3 (D. Del. June 15, 2020) (noting that an inmate's medical records indicated that his hypertension was "well-controlled" based on notes in his records stating "Blood pressure well controlled" and "The inmate stopped all his blood pressure medication over a month ago but the pressure is a bit elevated and we agree to start back at lower dose.").

Bardes, that any underlying health condition poses a greater risk if it is "uncontrolled." See

*Overview and Spectrum of COVID-19*, NIH. Indeed, the general statement that if a certain

underlying health condition is a risk factor, then more severe or uncontrolled manifestations of

that health condition are associated with a relatively higher risk of a severe case of COVID-19,

seems truistic. But the authorities cited above indicate an association simply between

"hypertension" broadly, and severe illness and death from COVID-19. None of these sources

indicate that people with certain ranges of blood pressure readings or stages of hypertension are

not at significant risk, and the Government does not offer any scientific research supporting such

a proposition. Indeed, one of the studies cited above concludes that hypertensive individuals,

medicated or not, face at least a two-fold risk of death from COVID-19 compared to non-

hypertensive individuals (although, according to this study, the risk is higher for those who are

not taking some form of medication). See Gao, et al., *Association of hypertension and*

*antihypertensive treatment with COVID-19 mortality: a retrospective observational study*,

EUROPEAN HEART JOURNAL, June 5, 2020.[33] Existing research indicates simply that hypertension

is a risk factor; and according to BOP medical professionals who have regularly examined him,

Salvagno has hypertension. While the Court has considered Dr. Bardes's statements, the Court is

not inclined to rely exclusively on the unique opinion of a single physician, who has never

examined the patient about he opines, especially given the lack of consensus in this complex area

of science, the wealth of research contradicting Dr. Bardes's assertions regarding the relationship

between hypertension and COVID-19, and the Government's acknowledgment that Dr. Bardes

---

[33]  See also Foreman, 2020 WL 2315908, at *3–4 (noting disagreement between the
parties over whether the defendant's blood pressure was "controlled" but finding an
"extraordinary and compelling reason" simply on the basis of her hypertension diagnosis).

has neither expertise in infectious disease nor experience with COVID-19. <u>See</u> Response at 3 n.2; Reply at 1 n.1.

As the Government correctly states, there is new scientific research relevant to the Court's statement in the April 23 Memorandum-Decision and Order that ACE inhibitors are hypothesized to increase the likelihood of infection with the virus. At the time of the April 23 Order, the CDC and some experts endorsed the hypothesis that ACE inhibitors increased the risk of infection, as did some courts. <u>See, e.g.</u>, <u>United States v. Roman</u>, No. 19-CR-116, 2020 WL 1908665, at *2 (S.D.N.Y. Mar. 27, 2020); <u>United States v. Gross</u>, No. 15-CR-769, 2020 WL 1673244, at *1 (S.D.N.Y. Apr. 6, 2020); <u>see also</u> Apr. 23 Mem.-Decision and Order at 10–11 (citing the CDC website and a scientific study). While there does not appear to be a scientific consensus on this issue; recent research has tended to undermine the hypothesis. <u>See, e.g.</u>, Williams and Zhang, *Hypertension, renin–angiotensin–aldosterone system inhibition, and COVID-19*, THE LANCET, May 14, 2020[34] (noting that the presence of hypertension as "one of the most common comorbidities" "fueled speculation" that ACE inhibitors were the culprit, but that new data from several studies has tended to undermine the hypothesis).

But this new information regarding ACE inhibitors, even if sufficient to undermine the hypothesis that ACE inhibitors increase the likelihood of infection, would not undermine the separate scientific claim that hypertension increases the risk of severe illness and death from COVID-19. As noted, people with hypertension face at least a two-fold risk of death from COVID-19 compared to non-hypertensive individuals, regardless of whether they are medicated.

---

[34] https://www.thelancet.com/journals/lancet/article/PIIS0140-6736(20)31131-4/fulltext

See Gao, et al., *Association of hypertension and antihypertensive treatment with COVID-19 mortality: a retrospective observational study*, EUROPEAN HEART JOURNAL, June 5, 2020.

Based on the well-established correlation between hypertension and severe manifestations of COVID-19, and the substantial chorus of experts who have found that there is a causal relationship, this Court did not clearly err in finding that Salvagno faced a heightened risk of severe illness and death should he contract the virus, on account of his hypertension and age. In adjudicating compassionate release applications during this pandemic, courts are constrained by incomplete and rapidly evolving scientific information. Given these limitations, this Court's factual determinations on April 23 that hypertension is a risk factor and that Salvagno faced a heightened risk of severe illness or death, were justified. Considering the development of scientific knowledge since April 23, these factual determinations are still justified.

### C.  Conditions at FCI Danbury

The Court next addresses conditions at FCI Danbury, another factual issue relevant both to the exhaustion issue and to the "extraordinary and compelling reason" analysis. In the April 23 Memorandum-Decision and Order, the Court noted that FCI Danbury reported a high number of COVID-19 cases and that features of the prison's internal architecture made social distancing more difficult than in other federal prisons. Apr. 23 Mem.-Decision and Order at 13–14. In an April 3 memorandum, Attorney General William Barr had specifically named FCI Danbury, along with only two other federal prisons, as a facility at which BOP should prioritize reviewing candidates for release to home confinement, because FCI Danbury was experiencing a "significant level[] of infection," and the spread of COVID-19 was "materially affecting operations" there. See Memorandum from the Attorney General to Director of Bureau of Prisons,

dated April 3, 2020, at 1–2 ("April 3 Memo").[35] On April 22, inmates at FCI Danbury filed a

habeas class action challenging conditions of confinement at FCI Danbury under the Eighth

Amendment. See Martinez-Brooks v. Easter, 20-CV-569, Dkt. No. 1 (D. Conn Apr. 22, 2020).

On May 12, the Martinez-Brooks court granted the plaintiffs' motion for a temporary restraining

order mandating that BOP release medically vulnerable inmates from FCI Danbury to home

confinement, given the uncontrolled COVID-19 outbreak at the facility. See Martinez-Brooks v.

Easter, 20-CV-569, 2020 WL 2405350, at *32–34 (D. Conn. May 12, 2020). Given the court's

factual findings in that case, it appears that this Court actually *understated* the severity of

conditions at FCI Danbury in the April 23 Memorandum-Decision and Order, in at least two

respects.

*1. Social distancing is "virtually impossible," not merely difficult.*

The Martinez-Brooks court painted a worrying picture of conditions at FCI Danbury. As

that court found, "The vast majority of the inmates at FCI Danbury live in large dormitory halls

lined with bunk beds, each housing roughly 50 or more inmates, with shared bathrooms and

common spaces. This arrangement makes effective social distancing virtually impossible." 2020

WL 2405350, at *4. "[A]t a time when public health officials are counseling strict adherence to

social distancing practice, most inmates at FCI Danbury live in close contact with between 50

and 140 other inmates, in a facility with a serious, active COVID-19 outbreak." Id. at *21.

This depiction of the FCI Danbury environment appears to accord with Salvagno's

assertions in Motion for Compassionate Release that he inhabited a densely populated communal

housing unit in which in which effective social distancing was not implemented despite several

---

[35] https://www.justice.gov/file/1266661/.

of his neighbors becoming infected. Mot. for Compassionate Release at 1–3. At least one other

court has recently echoed this characterization. United States v. Hilow, No. 15-CR-170, 2020

WL 2851086, at *4 (D.N.H. June 2, 2020) ("The risk of contagion at FCI Danbury is well

documented and is also confirmed by [defendant's] observations."). Specifically, the Hilow court

credited the inmate's assertions that she was "tightly housed with other inmates" and that inmates

who had exhibited symptoms of COVID-19 had been returned to her communal area in the

facility. Id.

At the time of the April 23 Memorandum-Decision and Order, the Court was aware of the

risk posed by FCI Danbury's internal architecture only in an abstract sense. Based on the

Martinez-Brooks court's account of the conditions that prevailed at FCI Danbury at the time of

the April 23 Memorandum-Decision and Order, the Court finds that there was a higher risk of

contagion than the Court initially described.

The Government contends that the Court overlooked a measure that FCI Danbury has

taken to ensure adequate social distancing, namely that "inmates have been isolated to their

housing units and are not exposed to other inmate groups." Mot. for Recons. at 11. As should be

clear from the facts detailed above, this action was likely not adequate. The dormitory-style

housing at FCI Danbury inhibits social distancing *within* housing units.

*2. The outbreak at FCI Danbury wass worse than BOP statistics suggested.*

The Government asserts that FCI Danbury had the COVID-19 outbreak under control at

the time of Salvagno's release, noting that the "number of affected inmates and staff has not

changed substantially" since April 23. Reply at 6. And indeed, as of June 19, the current active

case count was a mere single inmate. But this number fluctuated erratically and frequently in the

30

six weeks following Salvagno's release, both increasing and decreasing at times.[36] Meanwhile, the *total historical number* of reported cases, including both current reported cases and recovered inmates, steadily climbed following Salvagno's release.[37] According to one news source, 44 inmates had become infected by April 15. See Laura Cassels, *COVID-19 deaths in federal prisons rise to 15; about 700 staff and inmates sick*, PHOENIX, April 15, 2020.[38] A May 11 opinion notes 75 total historical inmate cases. See Foreman, 2020 WL 2315908, at *4 (D. Conn. May 11, 2020). The BOP website today notes 98 total historical inmate cases. See *COVID-19*, FEDERAL BUREAU OF PRISONS[39] (noting 98 total inmate cases).

Moreover, at least until June 13, when the BOP website began reporting the total number of tests conducted in each facility,[40] statistics on the BOP website communicated little

---

[36]  BOP reported high active case counts for a significant period after Salvagno's release. See United States v. Allinger, No. 19-CR-144, 2020 WL 3039144, at *1 (N.D. Cal. May 20, 2020) (noting that as of May 19, 2020 the facility had 34 active cases of inmates testing positive for COVID-19); United States v. Fleming, No. 18-CR-197, 2020 WL 2838511, at *3 (E.D.N.Y. June 1, 2020) (noting 15 active cases as of May 27); Reply at 6 (noting 21 active inmate cases as of June 3). The reported number is one active inmate case, as of June 19. *COVID-19 Cases*, Federal Bureau of Prisons, https://www.bop.gov/coronavirus/ (noting 1 active case).

[37]  The Government cites an opinion from April 24 in which a court cited BOP statistics. See Mot. for Recons. at 6. But the BOP website at that time did not report recovered cases. Hence, it is unclear what the total historical number was on April 24, and a comparison with the present figure is impossible based on those statistics.

[38] https://www.floridaphoenix.com/2020/04/15/covid-19-deaths-in-federal-prisons-rise-to-15-about -700-staff-and-inmates-sick/.

[39]  https://www.bop.gov/coronavirus/ (last visited Jun. 19, 2020).

[40]  See https://web.archive.org/web/20200612001405/https://www.bop.gov/coronavirus/ (June 12 archived version); https://web.archive.org/web/20200613121900/https://www.bop.gov/coronavirus/ (June 13 archived version).

information: the COVID-19 case count on the BOP website only represented the number of

positive cases among inmates actually tested, which was some unknown figure that was in most

facilities only a small fraction of the total inmate population. See, e.g., Segars, 2020 WL

3172734, at *3 ("[T]he Court's concern for Segars's safety is not dissuaded by the fact that FCI

Morgantown has no reported cases of COVID-19. The prison's report of zero confirmed cases is

more likely a result of a lack of testing than a lack of the virus' presence in the prison."); United

States v. Knox, No. 16-CR-116, 2020 WL 3207799, at *2 (N.D. Ala. June 15, 2020) (noting that

"[t]he Court does not have data about the extent of COVID testing at Aliceville FCI"); United

States v. Santiago, No. 10-CR-555, 2020 WL 3121146, at *4 (S.D.N.Y. June 12, 2020) ("There

is good reason to believe that the numbers report[ed] by the BOP understate the actual numbers

of tested-positive cases."); Pabon, 2020 WL 2112265, at *4 (stating that "[a]lthough the

government represents that Lewisburg Camp has no cases of COVID-19, the government never

says whether anyone has been tested," and that "[w]ithout mass testing—and any detailed

information about the current conditions at the Lewisburg Camp—the Court may be getting a

false picture"); United States v. Haney, No. 19-CR-541, 2020 WL 1821988, at *6 (S.D.N.Y. Apr.

13, 2020) (noting that BOP statistics "must be treated with great caution, as the BOP has so far

only tested for COVID-19 those prisoners who seem to be sufficiently unhealthy as to be in need

of possible hospitalization"); United States v. Esparza, No. 07-CR-294, 2020 WL 1696084, at *2

(D. Idaho Apr. 7, 2020) (noting that "testing inside prisons has been scant except for people who

self-report symptoms—which means that statistics about the number of infections already in

BOP facilities are largely meaningless") (citing Coronavirus Disease Inmate Screening Tool,

Federal Bureau of Prisons)[41]; United States v. Atkinson, No. 19-CR-55, 2020 WL 1904585, at *3 (D. Nev. Apr. 17, 2020) (same).

Indeed, the Martinez-Brooks court found that FCI Danbury had only sparsely tested inmates around the time of Salvagno's release. The Danbury federal prison complex has three connected facilities–the men's prison, the women's camp, and the women's satellite facility. See Martinez-Brooks, 2020 WL 2405350, at *4. According to the Warden at FCI Danbury, between the advent of the pandemic and May 12, of roughly 1000 inmates at the facility, only 205 inmates had been tested for COVID-19 throughout the Danbury complex. See id. at *6. This number included all 143 women at the satellite facility, where testing was conducted at the behest of Senator Christopher Murphy in early May. Id. Thus, by May 12, three weeks after Salvagno was released, a total of 62 tests had been conducted outside of the satellite facility, that is, in the men's prison and the women's camp combined. At that time, the men's prison had over 700 inmates. Id. at *4. It follows that, by May 12, well under 10% of inmates at Salvagno's facility within the Danbury complex had been tested. Because the BOP website around that time simply communicated the results of such limited testing, the numbers provided represented a floor, not a ceiling, with respect to active COVID-19 case counts. See id. at *20 ("The high rate of positive tests outside of the satellite prison, and significant questions raised by the Petitioners as to the adequacy of testing, suggest that [the number of reported cases as of May 12] may underrepresent the true number of COVID-19 infections at FCI Danbury."). At some point since May 12, a significant number of tests evidently were administered, although the Court does not know

---

[41] https://www.bop.gov/coronavirus/docs/covid19_inmate_screening_tool_20200202.pdf.

exactly when this occurred. See *COVID-19*, FEDERAL BUREAU OF PRISONS.[42]

The dearth of testing at FCI Danbury around the time of Salvagno's release, in addition to depriving the Court of relevant information, likely exacerbated the spread of the virus. "According to Leonard Rubenstein, a professor at [the] Johns Hopkins Bloomberg School of Public Health, '[u]nless you do universal testing in all environments, the risk of spread is enormous. If you are waiting for symptoms to emerge before you do the testing, you are getting a false picture of what is going on . . . . It's too late.'" Pabon, 2020 WL 2112265, at *5.

Accordingly, in order to capture an accurate picture of conditions at FCI Danbury around the time of Salvagno's release, the Court does not rely solely on contemporaneous BOP statistics. The Court is inclined to rely in part on the findings of the Martinez-Brooks court, which, "[w]ith the benefit of a much more fulsome record than is before this Court," see United States v. Young, No. 16-CR-40036, 2020 WL 2514673, at *2 (D. Mass. May 15, 2020), found that "the undisputed evidence leaves no doubt that FCI Danbury is experiencing an active outbreak of COVID-19," Martinez-Brooks, 2020 WL 2405350, at *20, and that the impossibility of implementing social distancing measures in a FCI Danbury's dormitory-style environment sustained and exacerbated this outbreak, id. at *4, 21. Other courts have relied on these findings as well. See, e.g., Young, 2020 WL 2514673, at *2; Hilow, 2020 WL 2851086, at *4; United States v. Flores, No. 19-CR-6163, 2020 WL 3041640, at *2 (W.D.N.Y. June 8, 2020).

Importantly, in light of the timing of the factual findings of the Martinez-Brooks court,

---

[42] https://www.bop.gov/coronavirus/ (last visited Jun. 19, 2020). Pursuant to a feature of the website added on June 13, the BOP website now reports that inmates at FCI Danbury have received a total of 838 tests. This number is cumulative, and it is inclusive of multiple tests given to the same inmate, as well as of tests any inmate received before being transferred to FCI Danbury. See id.

three weeks after Salvagno's release, these findings paint a clear picture of the risk to which Salvagno would have been exposed had he remained in prison. Conditions at FCI Danbury will eventually improve, but this ultimate event will not undermine the conclusion that Salvagno's release was necessary at the time of this Court's April 23 Memorandum-Decision and Order.[43] To the extent that the BOP measures the Government highlights were effective, these effects evidently were not felt at a time relevant to Salvagno.

Moreover, in general, the Government's canned recitation of general BOP policies, see Mot. for Recons. at 7–9, does little to illuminate realities at FCI Danbury in particular. Certain BOP facilities evidently have had special difficulties containing the spread of COVID-19, and FCI Danbury has been found by numerous courts and by the Department of Justice itself to be such a facility. Indeed, the Government conceded this fact in its response to Salvagno's initial Motion for Compassionate release. Dkt. No. 1163 at 2 (describing FCI Danbury as "one of the federal prisons known to be grappling with  COVID-19"). In its Motion for Reconsideration, the Government has not pointed to any new evidence that would disturb that conclusion.

---

[43]  In an ideal world, courts would order temporary release of some prisoners in facilities with active COVID-19 outbreaks. But federal courts do not have this authority. See United States v. Lagan, No. 18-CR-283, Dkt. No. 91 at 11 (N.D.N.Y. May 11, 2020) (Kahn, J.) (noting that federal courts do not have the authority to temporarily release inmates for the duration of the pandemic, and collecting cases).

### D.  Exhaustion

As amended by the First Step Act, Pub. L. No. 115-391, 132 Stat. 5194 (2018), the

compassionate release statute authorizes courts to modify terms of imprisonment:

> upon motion of the Director of the [BOP], or upon motion of the
> defendant after the defendant has fully exhausted all administrative
> rights to appeal a failure of the [BOP] to bring a motion on the
> defendant's behalf or the lapse of 30 days from the receipt of such
> a request by the warden of the defendant's facility, whichever is earlier[.]

18 U.S.C. § 3582(c)(1)(A).

The Government argues that courts cannot waive the compassionate release statute's

exhaustion requirement under any circumstances. Mot. for Recons. at 9–14. The Government

previously made this argument in its response to Salvagno's Motion for Compassionate release,

See 1163 at 2, and the Court rejected this argument, see Apr. 23 Mem-Decision and Order at

7–11. This is thus not a proper basis for reconsideration. See Associated Press, 395 F. Supp. 2d

at 19 (noting that "a motion for reconsideration is [not] an occasion for repeating old arguments

previously rejected"). Considering the Government's arguments on this point nonetheless, the

Court finds them unavailing, for reasons largely detailed in the April 23 Memorandum-Decision

and Order. The Court restates and elaborates on its prior reasoning here.

There is no Second Circuit authority addressing the question of whether § 3582's

exhaustion requirement can be waived. The Court recognizes that several of its sister courts have

ruled that § 3582's exhaustion requirement cannot be excused due to the exigencies of the

COVID-19 pandemic. See, e.g., United States v. Roberts, No. 18-CR-528, 2020 WL 1700032, at

*2–5 (S.D.N.Y. Apr. 8, 2020); United States v. Pereyra-Polanco, No. 19-CR-10, 2020 WL

1862639, at *1 (S.D.N.Y. Apr. 14, 2020); United States v. Hernandez, No. 18-CR-834, 2020 WL

36

1445851, at *1 (S.D.N.Y. Mar. 25, 2020). However, numerous other lower courts have

determined that the exhaustion requirement is excusable under certain circumstances. See, e.g.

United States v. Colvin, No.19-CR-179, 2020 WL 1613943, at *2 (D. Conn. Apr. 2, 2020);

United States v. Perez, No. 17-CR-513, 2020 WL 1546422, at *1 (S.D.N.Y. Apr. 1, 2020);

United States v. Zukerman, No. 16-CR-194, 2020 WL 1659880, at *3 (S.D.N.Y. Apr. 3, 2020).

As an initial matter, the Court agrees with its peers who have determined that § 3582's

exhaustion requirement is a claims-processing rule, rather than a jurisdictional requirement. A

rule qualifies as jurisdictional only if "Congress has clearly stated that the rule is jurisdictional."

Sebelius v. Auburn Reg'l Med. Ctr., 568 U.S. 145, 153 (2013). But § 3582 "does not speak in

jurisdictional terms or refer in any way to the jurisdiction of the [federal] courts." Haney, 2020

WL 1821988, at *3 (quoting Zipes v. Trans World Airlines, Inc., 455 U.S. 385, 394 (1982)).

Moreover, the provision is "not part of a jurisdictional portion of the criminal code but part of the

chapter dealing generally with sentences of imprisonment." Id. (quoting United States v. Taylor,

778 F.3d 667, 671 (7th Cir. 2015)). Rather, the exhaustion requirement "seek[s] to promote the

orderly progress of litigation by requiring that the parties take certain procedural steps at certain

specified times." Scparta, 2020 WL 1910481, at *4 (quoting Henderson v. Shinseki, 562 U.S.

428, 435 (2011)). It governs the process by which a compassionate release claim may be brought

(either via a motion by the BOP or directly, depending on the circumstances), who may bring

such claim (either BOP or the inmate), and when. See id. For these reasons, the rule is not

jurisdictional in nature. See United States v. McIndoo, No. 15-CR-142, 2020 WL 2201970, at *6

(W.D.N.Y. May 6, 2020) ("[Section] 3582(c)(1)(A)'s exhaustion requirement is a

claim-processing rule, not a jurisdictional prerequisite."); United States v. Gentille, No.

37

19-CR-590, 2020 WL 1814158, at *3 (S.D.N.Y. Apr. 9, 2020) (same).

Although § 3582's exhaustion requirement is not jurisdictional, whether the Court can excuse a defendant's failure to comply with this statutory requirement is a separate question, one the Court answers in the affirmative. "Even where," as here, "exhaustion is seemingly mandated by statute . . . the requirement is not absolute." Washington v. Barr, 925 F.3d 109, 118 (2d Cir. 2019). "Congressional intent is 'paramount' to any determination of whether exhaustion is mandatory." See Haney, 2020 WL 1821988, at *3 (quoting McCarthy v. Madigan, 503 U.S. 140, 144 (1992)).

In amending § 3582(c)(1)(A) via the First Step Act, Congress sought to "expand compassionate release" and "expedite[ ] compassionate release applications." 164 Cong. Rec. S7314-02, 2018 WL 6350790 (Dec. 5, 2018); see also Hearing on Compassionate Release and the Conditions of Supervision Before the U.S. Sentencing Comm'n (2016) (statement of Michael E. Horowitz, Inspector General, Department of Justice) ("The First Step Act—and the critical 30-day lapse route it provided [in § 3582(c)(1)(A)'s exhaustion requirement]—directly responded to a compassionate-release system so plagued by delay that prisoners sometimes died while waiting for the BOP to make a decision."). The passage of the First Step Act was partly inspired by a 2013 Inspector General report that found that due to a combination of inefficiency, unclear administrative compassionate release standards, and inconsistent application of those standards, an average of only 24 inmates had been released each year between 1984 and 2013. See United States v. Rodriguez, No. 03-CR-271, 2020 WL 1627331, at *2 (E.D. Pa. Apr. 1, 2020). The First Step Act amended existing law to allow prisoners to directly petition the court for compassionate release, thus removing BOP's "exclusive gatekeeper role," and allowing an

38

inmate to circumvent the then-existing obstacles of BOP's systemic neglect and arbitrary denial of compassionate release applications. See Martinez-Brooks, 2020 WL 2405350, at * 24.

The legislative history, in short, reflects a Congressional design to reform the broken process uncovered by the Inspector General report, and to increase its efficiency and responsiveness to urgent requests. These concerns are reflected in the statute, which instructs courts to consider whether any of a variety of exigent circumstances constitute "extraordinary and compelling reasons" that merit release. See United States v. Soto, No. 18-CR-10086, 2020 WL 1905323, at *5 (D. Mass. Apr. 17, 2020) (citing 18 U.S.C. § 3582(c)(1)(A)(i); U.S.S.G. § 1B1.13 cmt. n.1). It is evident from the context of enactment and the text itself that "Congress necessarily recognized that time is of the essence for determining whether compassionate release is appropriate." Id.; see also United States v. Russo, No. 16-CR-441,  2020 WL 1862294, at *1 (S.D.N.Y. Apr. 14, 2020) (noting that the 30-day rule was intended "as an accelerant to judicial review").

Prisons are "powder kegs for infection" and have allowed "the COVID-19 virus [to] spread[] with uncommon and frightening speed." United States v. Skelos, No. 15-CR-317, 2020 WL 1847558, at *1 (S.D.N.Y. Apr. 12, 2020); see also An Ohio prison is now the largest source of virus infections in the country, THE N.Y. TIMES, Apr. 20, 2020[44] (noting that "four of the 10 largest-known sources of infection in the United States were correctional facilities"). In light of the dangers posed by COVID-19 in the prison environment, the need to expedite consideration of requests for compassionate release premised on potential exposure to COVID-19 takes on even new urgency. See Haney, 2020 WL 1821988, at *4 (noting that "under present circumstances,

---

[44]  https://www.nytimes.com/2020/04/20/us/coronavirus-live-news.html#link-52cdb996.

each day a[n] [inmate] must wait before presenting what could otherwise be a meritorious petition threatens him with a greater risk of infection and worse"). Hence, the Court concludes that Congressional objectives underlying the First Step Act not only permit, but compel, courts to waive § 3582(c)(1)(A)'s exhaustion requirement in the face of the pandemic. See id. (concluding that "Congressional intent not only permits judicial waiver of the 30-day exhaustion period, but also, in the current extreme circumstances, actually favors such waiver, allowing courts to deal with the emergency before it is potentially too late"); Russo, 2020 WL 1862294, at *1 ("It would . . . certainly [be] inconsistent with congressional intent[] for the thirty days to serve as a substantial obstacle to effective judicial relief.").

The Government argues that the Court overlooked a controlling decision in Ross v. Blake, 136 S. Ct. 1850 (2016). See Mot. for Recons. at 10–14. But as this Court has previously reasoned, "Ross concerns the substantially different exhaustion requirement in a different statute, the Prison Litigation Reform Act (PLRA), and is thus not applicable here." United States v. Bass, No. 10-CR-166, 2020 WL 2831851, at *6 (N.D.N.Y. May 27, 2020) (Kahn, J.). Because, as the Government appears to acknowledge, the questions of whether and under what circumstances a statutory exhaustion requirement may be waived are determined largely in accordance with statute-specific considerations of Congressional intent, and because both the statutory exhaustion requirement in the PLRA and the Congressional intent underlying that provision are markedly and relevantly different, Ross is distinguishable. Under the PLRA, a prisoner cannot proceed to court until she has exhausted administrative remedies. Soto, 2020 WL 1905323, at *5. "The intent of this 'strengthened' PLRA exhaustion requirement is to 1) give an agency an opportunity to 'correct its own mistakes with respect to the programs it administers before it is haled into

federal court' and 2) promote efficiency so that some cases can be resolved quickly and efficiently administratively before proceeding to court." Id. (quoting Woodford v. Ngo, 548 U.S. 81, 89 (2006)).

The exhaustion requirement in § 3582, by contrast, does not serve either of these policy goals to the same extent. The apparent primary purpose of exhaustion under § 3582 is to determine whether an inmate will have the assistance of BOP in bringing her request to court. Id. The 30-day waiting period does not obviate the need for judicial intervention, to which the inmate is entitled regardless of BOP's determination. Id. And the statute permits the inmate to proceed to court even if the BOP neglects to act, which indicates Congressional recognition that the value of urgent resolution can outweigh the value of judicial economy served by BOP's input. Id.

For the reasons stated in the April 23 Memorandum-Decision and Order, the Court was justified in waiving exhaustion in Salvagno's case. Conditions at FCI Danbury created an extraordinary risk of contagion, and Salvagno's hypertension substantially increased his likelihood of serious illness or death should he contract the virus. Courts have found that such a risk justifies waiver of the exhaustion requirement. See, e.g., United States v. Sawicz, No. 08-CR-287, 2020 WL 1815851, at *2 (E.D.N.Y. Apr. 10, 2020) (waiving exhaustion because, in light of the defendant's hypertension and circumstances at FCI Danbury, "[t]he delay that the defendant would experience if he had to wait for thirty days to expire before pursuing a motion for compassionate release in this court would put him at significant risk of suffering catastrophic health consequences") (internal citations omitted); Scparta, 2020 WL 1910481, at *9 (waiving exhaustion for a 55-year-old inmate due to his hypertension and an outbreak at FCI Butner that

41

made the prison "a national leader in documented cases of COVID-19" at that time); <u>United States v. Coles</u>, No. 00-CR-20051, 2020 WL 1976296, at *5 (C.D. Ill. Apr. 24, 2020) (waiving the exhaustion requirement for an inmate at FCI Elkton, another facility named in the April 3 Memo, due to dire conditions at the facility); <u>Zukerman</u>, 2020 WL 1659880, at *3–4 (waiving exhaustion where defendant was elderly, obese, had diabetes and high blood pressure, and was incarcerated in FCI Otisville, where the internal architecture inhibits social distancing).

Facts that have come to light since the April 23 Memorandum-Decision and Order provide additional support for waiving exhaustion in Salvagno's case. As the court in <u>Martinez-Brooks</u> found, the Warden at FCI Danbury has systematically neglected compassionate release applications. <u>See</u> 2020 WL 2405350, at *25 ("[T]he Warden is processing request[s] for compassionate release based on COVID-19 at a pace that disregards the seriousness of the risk faced by medically vulnerable inmates."). Specifically, the <u>Martinez-Brooks</u> court found in its May 12 order that "[t]he figures show that over more than six weeks, FCI Danbury has not made even an *initial* response to some 44% of compassionate release requests, justifying the Petitioners' assertion that the staff at the facility are failing to timely respond to requests for emergency compassionate relief." <u>Id.</u> (internal quotation marks omitted).

To make matters worse, BOP's antiquated regulations, unchanged since long before the pandemic, provide an inefficient multi-tier appeals process that makes it extremely unlikely that an administrative compassionate release request filed by an FCI Danbury inmate would receive a response within the 30-day maximum period specified in the compassionate release statute. <u>Id.</u> As the court in Martinez-Brooks explained:

[An] initial response from the Warden—when it arrives—is only the first step in a multi-tiered administrative remedy process the inmate must follow to "fully exhaust[]" administrative remedies. That process requires each inmate to appeal the denial by the Warden to a BOP Regional Director, followed by an appeal to the BOP General Counsel. For each level of appeal, the inmate must use a different form and mail it to a different reviewing official. Even if the inmate's request to the Warden is approved—something that has not happened at Danbury since the outset of the pandemic—that approval must go through at least three more layers of review involving the BOP General Counsel, the Medical Director or an Assistant Director, and, finally, the Director. It does not appear that the BOP has updated these regulations since the First Step Act was passed, let alone made any attempt to suspend them or otherwise accelerate the process during the pandemic.

Id. Based on the realities of the FCI Danbury Warden's response time in processing initial requests, and the realities of delay on administrative appeal due to antiquated BOP regulations, the court in Martinez-Brooks fairly concluded that "as far as the record at FCI Danbury shows, it is practically impossible for a defendant to fully exhaust a compassionate release request within the BOP before expiration of the 30-day period, despite Congress's apparent intent." Id. (internal quotation marks omitted).

As discussed, the intent underlying the exhaustion requirement in the compassionate release statute evinces Congress's recognition that the value of urgent resolution can in some circumstances outweigh the value of judicial economy advanced by BOP's input. That the value of the former might outweigh the value of the latter is especially plausible in Salvagno's case, in light of the reality at FCI Danbury that the systemic failure to process administrative requests largely precludes BOP from correcting its mistakes, contributing its expertise, or developing a factual record to assist judicial review. Administrative dysfunction at FCI Danbury, even more so than at other federal prisons, turns "the 30-day period under the statute into simply dead time,

during which there is no prospect the BOP will come to the defendant's aid and no likelihood

that BOP will provide the Court with the benefit of its considerable expertise concerning both the

inmate and the conditions of confinement." United States v. Rountree, No. 12-CR-308, 2020 WL

2610923, at *5 (N.D.N.Y. May 18, 2020) (Kahn, J.) (internal quotation marks and alterations

omitted). It is unfathomable that Congress, which sought to streamline an inefficient

administrative compassionate release system and expedite urgent requests, intended that the

exhaustion requirement be applied to impose a 30-day cooling-off period that contributes

virtually nothing to judicial economy at likely significant prejudice to the inmate.[45] To be

explicit, it likely that Salvagno would have become severely ill or died while awaiting a BOP

response that probably would have never come.

---

[45]   To support its assertion that BOP's compassionate release process has been efficient
and effective, the Government states that BOP has consented to a sentence reduction in 55 cases.
Mot. for Recons. at 13. Without remarking on the significance of the fact that this number
represents a total across all BOP facilities, the Court notes that BOP declined to grant any
compassionate release requests at FCI Danbury around the time of Salvagno's release, in spite of
the COVID-19 outbreak at the facility. Martinez-Brooks, 2020 WL 2405350, at *25 (noting on
May 12 that "FCI Danbury staff has, to date, not granted a single request for compassionate
release"). As the Martinez-Brooks court noted, this may be attributable in part to the antiquated
pre-pandemic regulations BOP employs, which do not take COVID-19 into account. Id. (noting
that the health-related criteria BOP employs "make[] no mention of COVID-19 or the risk posed
by infectious diseases inside prisons in general, and restrict[] use of 'compassionate release'
authority to a few, extreme situations that have little to do with susceptibility to COVID-19").
Relatedly, it appears that, as of May 29, over two weeks after the May 12 order in that case, FCI
Danbury had not released a single inmate to home confinement pursuant to that order. Martinez-
Brooks, 20-CV-569, Dkt. No. 70 at 1.

### E.  "Extraordinary and Compelling Reasons"

The compassionate release statute authorizes a court to modify a term of imprisonment only if it finds that "extraordinary and compelling reasons warrant such a reduction." § 3582(c)(1)(A)(i). The Government argues that it "is aware of only one other case where a federal district court ordered compassionate release predicated solely on hypertension." Mot. for Recons. at 5. But, to be more precise, compassionate release is never "predicated solely" on a health condition. In Salvagno's case, like in most other COVID-19 compassionate release cases, the Court also took into account Salvagno's particular prison environment. Moreover, courts must always consider the §§ 3142(g) and 3553 factors, in addition to determining whether there is an "extraordinary and compelling reason" meriting release. As one court has noted, "[a] review of applicable COVID-19 case law . . . reveals varying information about defendants who suffer from hypertension . . . Importantly, however, these decisions are not inconsistent with one another because in each decision, the court looked beyond the medical conditions to determine whether release was appropriate." Catanzarite, 2020 WL 2786927, at *5. In Salvagno's case, an important factor that distinguished Salvagno from the many incarcerated adults who have hypertension is the extraordinary risk posed by his place of incarceration. See Foreman, 2020 WL 2315908, at *4 (noting in releasing a 58-year-old hypertensive inmate from FCI Danbury that "[i]f Ms. Foreman had been housed at a facility without any cases of COVID-19, perhaps her underlying medical conditions would not have warranted compassionate release. But the number of cases of COVID-19 at FCI Danbury creates potentially catastrophic consequences for her.").

Contrary to the Government's assertion that there is only one other case in which a Court found an "extraordinary compelling reason" to release an inmate with hypertension as her only

health condition, see Mot. for Recons. at 5 n.5, there are in fact at least nine cases in which courts

have released inmates with hypertension and no other recognized risk factors or conditions

known to be significant comorbidities. What almost all of these cases have in common is that the

inmate was housed in an unusually high-risk facility. See United States v. Goins, No.

11-CR-20376, 2020 WL 3064452 (E.D. Mich. June 9, 2020) (hypertension, FCI Elkton (one of

the three facilities named in the April 3 Memo))[46]; United States v. Field, No. 18-CR-426, Dkt.

No. 38 (S.D.N.Y. May 4, 2020) (hypertension, FCI Danbury); United States v. Anderson, No.

15-CR-30015, 2020 WL 2521513 (C.D. Ill. May 18, 2020) (hypertension, FCI Forest Low (253

confirmed cases)); Sawicz, 2020 WL 1815851 (hypertension, FCI Danbury); Soto, 2020 WL

2104787 (hypertension, MDC Brooklyn (27 reported cases, and facility lacks a separate medical

unit)). Scparta, 2020 WL 1910481 (hypertension, high cholesterol, sleep apnea, age 55, FCI

Butner (60 infected inmates, "the site of one of the worst outbreaks of COVID-19 in any federal

prison")); Foreman, 2020 WL 2315908 (hypertension, age 58, obesity (but not severe obesity as

defined by the CDC), FCI Danbury); Pena, 2020 WL 2301199 (hypertension, high cholesterol,

age 60, FCI Fort Dix ("Fort Dix . . .is the most heavily populated BOP facility and has had 43

confirmed cases of COVID-19")); United States v. Gonzalez, No. 05-CR-1292, 2020 WL

2766048 (S.D.N.Y. May 28, 2020) (hypertension, obesity (but not "severe" obesity as defined by

the CDC), FCI Schuylkill (no reported cases)).

One could argue that the additional medical conditions present in a few of these

---

[46]  While the defendant in this case asserted that his occasional use of a corticosteroid
weakened his immune system, id. at *3, it does not appear that the court factored this into its
analysis, see id. at *6 (concluding that "Goins' non-pulmonary hypertension, in combination with
the severe outbreak of COVID-19 at FCI Elkton, constitutes a serious medical condition, and that
condition is an 'extraordinary and compelling reason' warranting Goins' release.").

cases—high cholesterol, sleep apnea, and moderate obesity—distinguish them from Salvagno.

But as these conditions are generally not thought to be risk factors and are relatively uncommon

comorbidities, their contribution to the "extraordinary and compelling reasons" analysis was

likely minimal. Notably, there are no cases in which courts have granted relief solely on the basis

of any of these three conditions. In any case, as noted above, Salvagno's age is an additional

moderate contributor to his overall risk, a point made by the court in Foreman with respect to the

inmate's age of 58, which the court considered in combination with her hypertension. Foreman,

2020 WL 2315908, at *4; see also supra note 31.[47]

Regarding the precise severity of Salvagno's hypertension, this is apparently of minimal

legal relevance, as courts in cases in which "hypertension" combined with especially dire prison

conditions constituted an "extraordinary and compelling reason" have tended to rely simply on

the diagnosis of "hypertension."[48] Indeed, one of these courts found an "extraordinary and

compelling reason" without explicitly resolving a factual dispute over the precise severity of the

inmate's hypertension. See Foreman, 2020 WL 2315908, at *3–4 (noting disagreement between

_____

[47] And, although Salvagno did not mention his weight as a basis for release and the Court does not rely on it here, his health records indicate that he, like the defendants in Foreman, see 19-CR-62, Dkt. No. 62 at 7, and Gonzalez, see 12-CR-326, Dkt. No. 73 at 3, has recently registered an unhealthy weight but does not suffer from "severe obesity" as defined by the CDC. See Medical Records at 8 (6/23/2016 record noting that Salvagno's weight of 199 pounds at a height of 70 inches renders him "overweight"), 59 (10/31/2018 record noting weight of 205 pounds), 80 (10/17/2019 record noting weight of 189 pounds).

[48] But see Goins, 2020 WL 3064452, at *3–5 (considering blood pressure readings, and finding a combination of stage 2 and stage 1 readings over a period of 5 years, in combination with conditions at FCI Elkton, another facility named in the April 3 Memo, constituted "extraordinary and compelling reasons"). Salvagno's medical records are similar in some respects, as they contain recent stage 2 and stage 1 blood pressure readings and indicate that he continued to have stage 1 readings even while medicated. See id. at *3; supra notes 3, 4.

the parties over whether the defendant's blood pressure is "controlled" but finding an "extraordinary and compelling reason" simply on the basis of her hypertension diagnosis). This approach is persuasive, because, as discussed, it is justified by existing scientific research, which illuminates the association between hypertension and severe illness and death from COVID-19 but not the implications of specific blood pressure ranges. Moreover, when a prison facility poses as high a risk of contagion as FCI Danbury, it is unnecessary and unwise to split hairs over the precise severity of a recognized risk factor.

Regarding ACE inhibitors, only one of the cases cited above mentioned the effects of hypertension medication in the course of its analysis. See Pena, 2020 WL 2301199, at *4. Based on this, the Court finds the potential risk posed by ACE inhibitors was not necessary to the Court's conclusion in the April 23 Memorandum-Decision and Order that there was an "extraordinary and compelling reason" justifying release. Absent this factual premise, the Court reaches the same legal conclusion.

Apart from the cases cited above, there are numerous compassionate release cases in which courts have found that hypertension independently increases the risk of serious illness from COVID-19, while granting release to an inmate with multiple risk factors. See, e.g., DeBartolo, 2020 WL 3105032, at *2 (noting that "at least one recent study suggests hypertension increases the relative risk of mortality two-fold for a patient hospitalized with COVID-19, as compared with those without hypertension.") (citing Gao, et al., *Association of hypertension and antihypertensive treatment with COVID-19 mortality: a retrospective observational study*, EUROPEAN HEART JOURNAL, June 5, 2020); Williams-Bethea, 2020 WL 2848098, at *4 (noting that "[t]he Centers for Disease Control and Prevention has identified hypertension as a

48

comorbidity that increases the likelihood of serious risk from COVID-19," and that "[t]his Court has repeatedly recognized that COVID-19 presents a heightened risk for individuals with hypertension, like the Defendant") (citing *Interim Clinical Guidance for Management of Patients with Confirmed Coronavirus Disease*, CDC, and collecting cases); Pabon, 2020 WL 2112265, at *1 (noting that "[b]oth diabetes and hypertension have been identified as specific comorbidities associated with increased risk of infection and worse outcomes" and citing academic sources and New York state and city government data); Coles, 2020 WL 1976296, at *7 (noting that "[t]he Centers for Disease Control . . . has identified hypertension as a comorbidity that increases the likelihood of serious risk from COVID-19") (citing *Interim Clinical Guidance for Management of Patients with Confirmed Coronavirus Disease*, CDC); United States v. Robinson, No. 18-CR-597, 2020 WL 1982872 (N.D. Cal. Apr. 27, 2020) ("Robinson also suffers from hypertension, which the Centers for Disease Control and Prevention . . . have identified as another risk factor for severe COVID-19 complications.") (citing *Groups at Higher Risk for Severe Illness*, Centers for Disease Control); United States v. Dunlap, No. 02-CR-165, 2020 WL 2062311, at *2 (M.D.N.C. Apr. 29, 2020) (noting that "foremost among his various medical ailments is hypertension which . . . has been identified as a common, significant comorbidity of COVID-19, increasing his vulnerability of suffering severe illness and death," and citing the CDC and academic sources).

Additionally, in other legal contexts, courts have embraced the proposition that hypertension increases the risk of severe illness from COVID-19. See, e.g. Bray-D9, 2020 U.S. Dist. LEXIS 85975, at *9 (granting pre-trial release to 48-year-old hypertensive inmate otherwise "in good health," noting that "new studies identify an increased risk of death from the virus for

individuals with hypertension . . . the Court considers these studies indicating

that hypertension may be an emerging risk factor for the virus") (citing news articles and recent

CDC data); United States v. Gamble, No. 19-CR-348, Dkt. No. 59 at 8 (D.D.C. Apr. 13, 2020)

(granting pre-trial release to a hypertensive inmate and noting that "the [WHO] classifies those

with hypertension as having an increased risk for severe disease and death as a result of COVID-

19, with a mortality rate of 8.4%") (citing *Report of the WHO-China Joint Mission on*

*Coronavirus Disease 2019 (COVID-19)*, WHO, at 12); Smith v. Warden, Toledo Corr. Inst., No.

12-CV-425, 2020 WL 1815717, at *14 (S.D. Ohio Apr. 9, 2020) (granting hypertensive inmate's

habeas petition, noting that "the threat [of COVID-19] is particularly significant—indeed,

critical—as to those individuals who suffer from preexisting conditions—including Petitioner,

who has hypertension") (citing New York State government data).

    For the reasons stated, the Court finds no clear error of law in its finding on April 23 that,

against the backdrop of a high risk of contagion at FCI Danbury, Salvagno's hypertension,

particularly given his age, constituted an "extraordinary and compelling reason" for release.

### F.  Remaining Portion of Salvagno's Sentence

    The relative length of the remaining portion of Salvagno's sentence is relevant under the

§ 3553 sentencing factors. At the time of his release, Salvagno had served 15 years of a 25-year

initial sentence. He was due to be released in 6 years. Put differently, he had roughly 40% of his

initial sentence and 29% of his projected sentence remaining. In the April 23 Memorandum-

Decision and Order, the Court cited cases in which inmates had been released with between 2

and 5 years, and between 19% and 87% of their projected sentences remaining. Apr. 23 Mem.-

Decision and Order at 14–15. Notwithstanding those citations, the Government asserts that

Salvagno's release was unprecedented in this respect and thus, impliedly, a clear error of law.

Mot. for Recons. at 5 n.5. This was untrue on April 23 and is even less true today.

Throughout this pandemic, courts have released inmates with remaining years and

percentages on their sentences comparable to and in excess of the remaining portion of

Salvagno's sentence. In many of these cases, inmates were housed in unusually high-risk

facilities. See ,e.g., United States v. Valencia, No. 15-CR-163, 2020 WL 2319323 (S.D.N.Y.

May 11, 2020) (hypertension and heart disease; FCI Danbury; roughly 3 years remaining on

initial 10-year sentence (30%) and same period remaining until projected release date (30%));

United States v. Delgado, No. 18-CR-17, 2020 WL 2464685 (D. Conn. Apr. 30, 2020) (Obesity

and sleep apnea; FCI Danbury; roughly 7.5 years remaining on initial 10-year sentence (75%) and

same period remaining until projected release date (75%)); Williams-Bethea, 2020 WL 2848098

(age 50, hypertension and obesity; FCI Danbury; 29 months remaining on initial 40-month

sentence (73%) and 23 months until projected release date (68%)); Harrell v. United States, No.

13-CR-20198, 2020 WL 2768883 (E.D. Mich. May 28, 2020) (hypertension, high cholesterol,

and diabetes; FCI Danbury; 8 years remaining on initial 15-year sentence (53%) and 6 years until

projected release date (46%)); United States v. Brannan, No. 15-CR-80, 2020 WL 1698392 (S.D.

Tex. Apr. 2, 2020) (age 66, hypertension, and high cholesterol; FCI Oakdale I (one of three

facilities named in the April 3 Memo, along with FCI Danbury); 2 years remaining on 3 year

sentence (67%) and same period remaining until projected release date (67%)); United States v.

Guzman, No. 13-CR-576, 2020 WL 2781713 (N.D. Ill. May 28, 2020) (age 67, hypertension, and

high cholesterol; FCI Elkton; roughly half of initial 12.5-year sentence remaining (50%) and 4

years until projected release date (40%)); United States v. Echevarria, 17-CR-44, 2020 WL

2113604 (D. Conn. May 4, 2020) (age 48 and asthma; FCI Allenwood (no reported cases); 39

months remaining on initial 48-month sentence (81%))[49]; Goins, 2020 WL 3064452

(hypertension; FCI Elkton; roughly 4 years remaining on initial 13-year sentence (40%))[50];

Anderson, 2020 WL 2521513 (hypertension; FCI Forest Low; initially sentenced to 8 years

imprisonment, 1 year remaining until projected release date (more than 13%))[51]; Field, Dkt. No.

38 (hypertension; FCI Danbury; roughly 10 months remaining on initial 21-month sentence

(48%) and 7 months until projected release date (39%)); Foreman, 2020 WL 2315908

(hypertension, age 58, obesity (but not severe obesity as defined by the CDC); FCI Danbury; 9.5

months remaining on 1-year sentence (80%) and same period remaining until actual release date

(80%)); Pena, 2020 WL 2301199 (hypertension, high cholesterol, age 60; FCI Fort Dix; roughly

3 years remaining on initial 84-month sentence (40%) and 21 months until projected release date

(30%)); Sawicz, 2020 WL 1815851 (hypertension; FCI Danbury; 10.5 months remaining on 5-

year sentence (19%) and same period remaining until projected release date (19%)); Gonzalez,

2020 WL 2766048 (hypertension and obesity (but not "severe" obesity as defined by the CDC);

FCI Schuylkill (no reported cases); roughly 5.5 years remaining on initial 14-year sentence (40%)

---

[49]  It is unclear from the docket what the defendant's projected release date was.

[50]  The court in this case noted that there had been confusion at the defendant's initial
sentencing regarding the amount of credit he would receive toward his federal sentence for time
served at a state facility, and that according to the mistaken understanding of the judge and the
Government at the time of sentencing, he would have 2 years, or 20% of his sentence remaining
until his projected release date as of the date of the order granting his compassionate release
application. Id. at *2. The Court took this into account in assessing the sentencing factors for
purposes of compassionate release. Id. at *6.

[51]  It is unclear from the docket when the defendant initially surrendered to the United
States Marshal.

and roughly 3.5 years remaining until projected release date (30%)). At least three of these cases

mentioned involved mandatory minimum sentences, making substantial sentence reductions

especially remarkable. See, e.g., Valencia, 2020 WL 2319323, at *1; Delgado, Dkt. No. 72 at 11

Sawicz, Dkt. No. 62 at 2 n.4.

Both the remaining number of years and the remaining percentage of a sentence are

potentially relevant under the § 3553 sentencing factors in a compassionate release context. But

in the context of a sentence as long as Salvagno's, the Court finds the remaining percentage to be

more instructive, as a percentage calculation factors in the significant amount of time Salvagno

had already served. Employing similar logic in the context of assessing § 3553 factors, several

courts have released inmates who had served more than half of initial sentences of significant

length. See, e.g., Goins, 2020 WL 3064452, at *7 (noting in releasing an inmate who had served

8 years of an initial 13-year sentence that "[h]e has served over 65% of the sentence formally

imposed . . . and over 80% of the time in custody that the parties intended him to serve. He has

already suffered meaningful and substantial punishment for his crimes . . . In addition, releasing

Goins is consistent with the goal of deterrence. The substantial period of custody that Goins has

served is sufficient to deter him from committing future offenses."); United States v. Acoff, No.

09-CR-73, 2020 WL 2781798, at *3 (D. Conn. May 29, 2020) (noting in releasing an inmate

with about 40 months remaining on a 96-month sentence (42%) and roughly two years remaining

until his projected release date (30%), that "given that he has already served more than half of his

sentence . . . requiring further prison time is not worth the risk of serious harm or death that it

entails"); Gonzalez, 2020 WL 2766048, at *1 (noting in releasing inmate with roughly 5.5 years

remaining on a 14-year sentence (40%) and roughly 3.5 years remaining until his projected

53

release date (30%), that "[h]e has already served more than eight years in prison" and "the time he has served in prison has already achieved much of the original sentence's retributive, deterrent, and incapacitative purpose") (internal quotation marks and alterations omitted); United States v. Malone, No. 12-CR-146, 2020 WL 3065905, at *7 (W.D. La. June 9, 2020) (noting in releasing inmate with roughly 4.4 years remaining on a 9.75 year sentence (45%) and three years remaining until his projected release date (35%), that "[t]he time he has already served in prison has achieved much of the original sentence's purpose in terms of reflecting the seriousness of the offense, promoting respect for the law, providing just punishment, and providing a deterrent effect. A reduction in his sentence will not override the punishment he has already been subjected to, nor will it eradicate the effects of the Court's original sentence").

Moreover, the unique mix of mitigating factors in this case under §§ 3553 and 3142(g) merited release when considered in combination. Salvagno presented a re-entry plan that was especially promising, as it provided concrete assurances that he would make a transformation to a law-abiding life. He posed a minimal risk of violence and had no criminal history prior to the instant offense. He had already served 15 years in prison, which served as a powerful general deterrent to similar crimes, incapacitated Salvagno for a significant portion of his adult life, served as an effective specific deterrent with respect to any future criminal behavior by Salvagno himself upon his release, and constituted a profound punishment for Salvagno's serious crimes. And further imprisonment was likely to impose greater punishment than necessary to serve the purposes of sentencing—namely, severe illness or death from COVID-19. The Court finds that it properly assessed the relevant §§ 3553 and 3142(g) factors and accordingly declines to reconsider this aspect of its April 23 opinion.

V.      **CONCLUSION**

Accordingly, it is hereby:

**ORDERED**, that the Government's Motion for Reconsideration (Dkt. No. 1168) is

**DENIED**; and it is further

**ORDERED**, that the Clerk shall serve a copy of this Memorandum-Decision and Order

on all parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

DATED:          June  22 2020
                      Albany, New York

_____
Lawrence E. Kahn
Senior U.S. District Judge